(No. 86161.— <span></span> )

*In re* D.L., A Minor (The People of the State of Illinois, Appellee, v. Tawanda R., Appellant).

*Opinion filed March 23, 2000.*

FREEMAN, J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (James H.

Reddy and William M. Brennan, Assistant Public Defenders, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb, Kenneth T. McCurry, Gunta Z. Hadac and Teresa A. Maganzini, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Lee Ann Lowder, Assistant Public Guardian, of counsel), for minor appellee.

JUSTICE MILLER delivered the opinion of the court:

Following an evidentiary hearing in the circuit court of Cook County, the trial judge concluded that the respondent, Tawanda R., was not an unfit parent, and the court therefore denied a petition filed by the State that sought the termination of Tawanda's parental rights with respect to the minor child, D.L. The appellate court reversed, concluding that Tawanda's unfitness had been established, and remanded the cause for further proceedings. 298 Ill. App. 3d 905. We allowed Tawanda's petition for leave to appeal (177 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

The facts in this case, although lengthy, are not in dispute. Tawanda gave birth to the minor, D.L., on July 8, 1992. This was Tawanda's second child, and toxicology reports showed that D.L., like his older brother, H.L., tested positive for cocaine at birth. D.L. also tested positive for opiates. Tawanda admitted to the attending physician that she had used cocaine while pregnant with D.L. and had used the drug just three weeks before the child's birth.

On September 15, 1992, the Department of Children and Family Services (DCFS) filed a petition for adjudica-

tion of wardship on D.L.'s behalf, alleging that he was neglected because he had been exposed to an injurious environment and because at the time of birth he tested positive for cocaine and opiates. On the same day, DCFS was appointed as temporary custodian of D.L. The child was initially placed with his maternal grandmother, but he was later removed from that home because of additional medical neglect. D.L. was subsequently placed in the home of Ida Palmer, a foster parent, and he has remained in Palmer's care since that time. During the first six weeks that D.L. was with Palmer, she took him to a pediatrician several times because he was suffering from diarrhea, vomiting, and dehydration. The condition persisted, and Palmer took D.L. to the hospital on December 16, 1992. Two days later, Family Care Services, a foster agency with which DCFS had contracted to monitor care for D.L. and his brother, H.L., noted that D.L. had symptoms of withdrawal and tremors.

Tawanda did not maintain contact with DCFS from July 1992 to July 1993, and during that time she failed to participate in any drug treatment program, though on several occasions she had promised to do so. On February 9, 1993, the circuit court found that D.L. was neglected because of lack of care, exposure to an injurious environment, and exposure to drugs at birth. On March 23, 1993, D.L. was adjudicated a ward of the court, and DCFS was appointed as D.L.'s guardian. The court found that Tawanda was unable or unwilling to provide for D.L.

Tawanda did not contact Family Care Services from January 1993 through October 1993. In September 1993, the agency attempted to reach Tawanda and left a card and telephone number with Tawanda's grandmother. In November 1993, Tawanda called the agency and asked if she could visit D.L. before entering a drug treatment program. An agency representative explained the steps

that Tawanda would need to take to obtain visitation with D.L. and to regain custody of him. Tawanda asked repeatedly to see D.L. that day or the next. An agency representative said that she would schedule a visit and would notify Tawanda of the date and time, once the visit had been arranged. Within 10 days, the agency called to inform Tawanda of the scheduled visit, but Tawanda's mother said that she had not seen Tawanda for a week. Tawanda did not appear for the scheduled visit.

In March 1994, Tawanda again enrolled in a drug treatment program. She was asked to leave the program after only three weeks of treatment, however, because she violated the rules. In May 1994, DCFS rated Tawanda's progress as unsatisfactory because she was uncooperative, did not complete a drug treatment program, and had not visited D.L. during the previous year. After that assessment, Tawanda visited D.L. three times between May 1994 and November 1994. D.L. remained in Ida Palmer's care.

On March 16, 1995, the State filed a supplemental petition for appointment of a guardian with authority to consent to D.L.'s adoption. The petition alleged that D.L.'s parents were unfit, pursuant to section 2—29 of the Juvenile Court Act of 1987 (705 ILCS 405/2—29 (West 1994)) and section 1 of the Adoption Act (750 ILCS 50/1 (West 1994)), and alleged five distinct grounds of unfitness. Service on Tawanda was accomplished by publication. On June 6, 1995, Tawanda failed to appear on the scheduled court date. She was found in default, and the case was then set for a hearing on the petition. On September 27, 1995, Tawanda appeared in court, and the circuit judge vacated the earlier default order. Tawanda told the judge that she wanted to regain custody of D.L., and the judge appointed counsel to represent her in the matter. On November 20, 1995, Tawanda entered a drug

treatment program. She visited D.L. in December of that year, bringing him several gifts. D.L. commented that he wanted to give several of the gifts to his mother, referring to his foster mother, Ida Palmer. Between December 1995 and April 1996, Tawanda met regularly with D.L. and cooperated with her supervisors, but her supervisors believed that D.L. was not yet ready to be returned to Tawanda.

In August 1996, Larry M. Small, a clinical psychologist, conducted a bonding and attachment assessment regarding Tawanda and D.L. At first, D.L. did not recognize Tawanda and when asked who she was, replied, "Nobody." Small reported that Tawanda showed little regard for D.L.'s emotional state and was not concerned that he might be confused or upset by being told that Tawanda was his mother. Small recommended that Tawanda not have unsupervised visitation with D.L. until she maintained a regular visitation schedule with him. Tawanda next saw D.L. in October 1996. In November or December 1996, Tawanda and her now-husband, Craig, who is not D.L.'s biological father, visited D.L. together. On December 5, 1996, the court denied Tawanda's motion for unsupervised visitation with D.L.

An evidentiary hearing on the petition to terminate parental rights commenced in February 1997 and was completed in June 1997. The parties introduced evidence, as described above, regarding Tawanda's conduct and activities in the time following D.L.'s birth. At the conclusion of the hearing, the trial judge ruled that Tawanda was not an unfit parent primarily because she had been drug-free for nearly two years. The judge concluded that the State had failed to prove any of the grounds of unfitness alleged against Tawanda. Separately, the court concluded that D.L.'s biological father was unfit; the propriety of the ruling concerning the father is not at issue here.

Both the guardian and the State appealed from the circuit court's determination that Tawanda was not an unfit parent. The appellate court reversed the circuit court judgment and remanded the cause for further proceedings. 298 Ill. App. 3d 905. The appellate court concluded that the State had established at least three grounds on which Tawanda was an unfit parent. Regarding the allegation of unfitness based on section 1(D)(m) of the Adoption Act, which provides that a parent is unfit if, within 12 months of an adjudication of neglect, abuse, or dependency, the parent fails to make reasonable efforts to correct the conditions that led to the removal of the child or reasonable progress toward the return of the child, the appellate court found that the circuit judge erred in considering Tawanda's behavior more than 12 months after the adjudication of neglect in this case. The court believed that section 1(D)(m) of the Adoption Act limits the fact finder to a consideration of conduct by the parent during 12 months after an adjudication of neglect, regardless of the date of the subsequent hearing to determine parental fitness. In reaching this result, the appellate court declined to follow decisions from other panels of the appellate court that have allowed a judge considering an allegation of unfitness under section 1(D)(m) to consider the parent's conduct during the entire period of time between the adjudication of neglect, abuse, or dependency and the parental fitness hearing. See, *e.g.*, *In re C.R.*, 221 Ill. App. 3d 373, 381 (1991); *In re A.T.*, 197 Ill. App. 3d 821, 832 (1990); *In re R.S.*, 174 Ill. App. 3d 132, 133-34 (1988). The appellate court remanded the matter so that the circuit court could proceed to the next stage in the action and determine whether termination of Tawanda's parental rights would be in the best interests of D.L. We allowed Tawanda's petition for leave to appeal (177 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

Section 1(D) of the Adoption Act defines the term "[u]nfit person" and lists a variety of discrete grounds on which a person may be found unfit. Before this court, Tawanda challenges only one of the grounds on which the appellate court determined that she could be found unfit. Tawanda's failure to challenge the other grounds considered by the appellate court renders the present appeal moot. Nonetheless, we choose to decide the case on its merits, under the public interest exception to the mootness doctrine. The interpretation of the statute is of substantial public importance, the relevant appellate court precedents are in conflict, and the issue is one that is likely to recur. See *In re A Minor*, 127 Ill. 2d 247, 257 (1989).

Relevant here is section 1(D)(m) of the Adoption Act, which provides, as a basis on which a finding of unfitness may rest:

"Failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor under the Juvenile Court Act or the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m) (West 1994).

The narrow question before us in this appeal concerns the 12-month period specified in the preceding statute. In concluding that Tawanda was not unfit under this provision, the trial judge relied on conduct occurring more than 12 months after the adjudication of neglect. The guardian argues that the appellate court correctly construed the 12-month period contained in section 1(D)(m) as limiting the evidence that may be introduced on that ground to matters occurring within the applicable 12-month span. Opposing the appellate court's determination, Tawanda contends that the time limit prescribed by section 1(D)(m) simply establishes a minimum period

of time before a petition alleging that ground may be filed and does not preclude the parties from offering evidence of a parent's actions after the expiration of the 12-month period. The State agrees with Tawanda's interpretation of the statutory language, but the State believes that the appellate court in the present case reached the correct result because the evidence presented in the circuit court, including the testimony relating to Tawanda's activities more than 12 months after the adjudication, established Tawanda's unfitness under this provision.

The cardinal rule of statutory construction is to ascertain and give effect to the intention of the legislature. *Nottage v. Jeka*, 172 Ill. 2d 386, 392 (1996); *Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 454 (1995). The language of the statute is the best indication of legislative intent, and our inquiry appropriately begins with the words used by the legislature. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 207 (1991). If the statutory language is clear and unambiguous, then there is no need to resort to other aids of construction. *Henry v. St. John's Hospital*, 138 Ill. 2d 533, 541 (1990); *County of Du Page v. Graham, Anderson, Probst & White, Inc.*, 109 Ill. 2d 143, 151 (1985). Moreover, there is no rule of construction that authorizes a court to say that the legislature did not mean what the plain language of the statute provides. *People ex rel. LeGout v. Decker*, 146 Ill. 2d 389, 394 (1992). "Where the language of a statute is clear and unambiguous, a court must give it effect as written, without 'reading into it exceptions, limitations or conditions that the legislature did not express.'" *Garza v. Navistar International Transportation Corp.*, 172 Ill. 2d 373, 378 (1996), quoting *Solich v. George & Anna Portes Cancer Protection Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994).

We agree with the guardian and the appellate court below and conclude that section 1(D)(m) of the Adoption Act limits the evidence that may be considered under the provision to matters concerning the parent's conduct in the 12 months following the applicable adjudication of neglect, abuse, or dependency. The statute plainly states that a parent is unfit if the parent fails to make either reasonable efforts to correct the conditions that led to the child's removal or reasonable progress toward return of the child within 12 months after an adjudication of neglect, abuse, or dependency. Giving effect to the plain language of section 1(D)(m), we conclude that the relevant period of time under this provision, in which the parent's efforts or progress must be assessed and measured, is the 12-month period following the adjudication.

If the legislature had meant merely to provide a minimum period of time before which a petition alleging this particular ground could be filed, as the mother and the State suggest, then the legislature could have simply and explicitly stated that a petition to terminate parental rights on the ground specified in section 1(D)(m) must be filed 12 or more months after the adjudication of wardship, without suggesting any limitation on the period from which the evidence could be drawn. In that way, evidence of efforts made by the parent after passage of the time limit could still be presented.

We note that the legislature has employed a number of different time periods in some of the grounds of unfitness found under section 1(D) of the Adoption Act. See, e.g., 750 ILCS 50/1(D)(c) (West 1994) ("Desertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding"); 750 ILCS 50/1(D)(k) (West 1994) (habitual drunkenness or addiction to drugs "for at least one year immediately prior to the commencement of the unfitness proceeding"); 750 ILCS 50/1(D)(l) (West 1994) ("Failure to demonstrate a reason-

able degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth"). Other grounds of unfitness contained in section 1(D) specify no applicable time period. The varying presence and absence of time periods in the provisions under section 1(D) demonstrates to us that the legislature believed that, for purposes of establishing certain allegations of unfitness, a parent's conduct during a specified period of time would be relevant. We note also that the legislature amended the Adoption Act in 1994 by adding the following provision:

"It is in the best interests of persons to be adopted that this Act be construed and interpreted so as not to result in extending time limits beyond those set forth herein." 750 ILCS 50/20a (West 1994).

We believe that construing section 1(D)(m) in the manner proposed by Tawanda and the State would be inconsistent with the preceding provision.

The State and the mother raise several arguments in opposition to this construction of the statute. First, the State contends that the appellate court's holding here could permit parents to defeat allegations of unfitness under section 1(D)(m) of the Adoption Act by making reasonable efforts or progress within the 12-month period specified in the statute even though they later fail to progress or continue with those efforts. The State contends that the appellate court's decision here would preclude a trial court from finding unfitness under section 1(D)(m) in those circumstances, when a parent's conduct after the 12-month period ends should be deemed sufficient to establish unfitness under the provision. We do not believe that the concern raised by the State should cause us to overlook the plain language of the statute. We note, too, that other grounds of unfitness may be applicable in that instance and could also be alleged in support of a petition to terminate parental rights. See, *e.g.*, 750 ILCS 50/1(D)(b) (West 1994) ("Failure to maintain a

reasonable degree of interest, concern or responsibility as to the child's welfare").

The State also notes that the legislature amended section 1(D)(m) effective June 25, 1997, to shorten the applicable time period from 12 months to 9 but did not make any other changes to the statutory language at issue here. Pub. Act 90—28, eff. June 25, 1997. The State contends that the legislature, by this recent action, has implicitly endorsed the interpretation given to the provision by a number of appellate court decisions that have construed the statute in the same manner urged by the State and Tawanda in this appeal. We do not agree. Other appellate court cases have applied the interpretation we adopt here (see *In re M.C.*, 201 Ill. App. 3d 792, 798 (1990); *In re E.J.F.*, 161 Ill. App. 3d 325, 330 (1987)), and thus the legislature's recent action could equally signify satisfaction with that group of decisions.

Tawanda urges that the failure to consider evidence generated after expiration of the 12-month period specified in the statute could be contrary to the best interests of the child involved in the proceeding. She contends that a court considering an allegation of unfitness under section 1(D)(m) should be permitted to consider the full range of the parent's conduct following the adjudication of neglect, abuse, or dependency, even if the conduct occurs more than 12 months after the adjudication. We do not believe that Tawanda's concern in this regard is well taken. If a parent is found unfit under section 1(D)(m), evidence of the parent's conduct occurring more than 12 months after the adjudication of neglect, abuse, or dependency may be introduced at the second stage of the termination proceedings, at which the court must consider the best interests of the minor involved in determining the youth's eventual placement. See *In re Adoption of Syck*, 138 Ill. 2d 255, 276-77 (1990). That will mark the next stage in these proceedings, and

Tawanda will then have an opportunity to present evidence of her more recent conduct as part of that inquiry.

In the present case, D.L. was adjudicated neglected on February 9, 1993, and therefore the relevant time period under section 1(D)(m) extended from that date until February 1994. As the appellate court below noted, during this period Tawanda was a drug addict and showed virtually no interest in D.L. She stopped using drugs in September 1995, but that was not until more than two years after the neglect adjudication. 298 Ill. App. 3d at 921. On this record, we agree with the appellate court that the trial judge's finding that Tawanda was not unfit under section 1(D)(m) of the Adoption Act was against the manifest weight of the evidence.

As a final matter, we note that the present case illustrates the problems of delay that can occur within this branch of the child welfare system. D.L. was born more than seven years ago, in 1992, and was adjudicated neglected in February 1993. The State filed its petition seeking termination of Tawanda's parental rights in March 1995. The evidentiary hearing on the petition did not commence for nearly two years, however. We express no view on where D.L.'s best interests might lie, but we do know that it is not in his best interests for his status to remain in limbo for an extended period of time. For these reasons, we direct the courts below to consider, in an expedited manner, cases involving children like D.L., so that the minors whose futures are at stake in these proceedings can obtain a prompt, just, and final resolution of their status.

For the reasons stated, the judgment of the appellate court, remanding this cause to the circuit court of Cook County for further proceedings, is affirmed.

*Affirmed.*

JUSTICE FREEMAN, specially concurring:
The appellate court found that the State had estab-

lished three grounds for a finding of unfitness: (1) Tawanda failed to maintain a reasonable degree of interest, concern, or responsibility as to D.L.'s welfare (750 ILCS 50/1(D)(b) (West 1994)); (2) Tawanda was addicted to drugs for at least one year preceding the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 1994)); and (3) Tawanda failed to make reasonable progress toward the return of D.L. within 12 months after the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1994)). In this court, Tawanda challenges only the finding, pursuant to section 1(D)(m), that she failed to make reasonable progress toward the return of D.L. Since a finding of unfitness may be based on any one of the grounds noted above, this court must affirm the judgment of the appellate court, and remand for a hearing on the termination of Tawanda's parental rights. Thus, I concur in the result reached by the majority.

I write separately, however, because I disagree with the holding of the majority that the plain language of section 1(D)(m) limits the evidence that may be considered in a fitness hearing to matters concerning the parent's conduct in the 12 months following an adjudication of neglect, abuse, or dependency. This holding overrules a long and harmonious line of authority construing the time period in section 1(D)(m) as a limitation on the right of the State to institute a proceeding for termination of parental rights and not as a limitation on the evidence the trial court may consider in making a determination on parental fitness. I believe this line of authority construed the statute properly. I also believe the majority has failed to give effect to the intention of the legislature and has severely limited the ability of the trial court to make an appropriate determination regarding parental fitness. Lastly, the majority's holding is contrary to the best interests of the children and parents involved in these proceedings.

Several panels of the appellate court have held that, in determining whether a parent is an "unfit person," a trial court may consider the parent's conduct during the entire period of time between the adjudication of neglect, abuse, or dependency and the fitness hearing. See *In re Latifah P.*, 307 Ill. App. 3d 558 (1999); *In re H.C.*, 305 Ill. App. 3d 869 (1999); *In re Y.B.*, 285 Ill. App. 3d 385 (1996); *In re J.T.C.*, 273 Ill. App. 3d 193 (1995); *In re A.P.*, 277 Ill. App. 3d 592 (1996); *In re D.J.*, 262 Ill. App. 3d 584 (1994); *In re S.J.*, 233 Ill. App. 3d 88 (1992); *In re C.R.*, 221 Ill. App. 3d 373 (1991); *In re S.G.*, 216 Ill. App. 3d 668 (1991); *In re M.S.*, 210 Ill. App. 3d 1085 (1991); *In re M.C.*, 201 Ill. App. 3d 792 (1990); *In re A.T.*, 197 Ill. App. 3d 821 (1990); *In re R.S.*, 174 Ill. App. 3d 132 (1988); *In re Allen*, 172 Ill. App. 3d 950 (1988); *In re Doolan*, 101 Ill. App. 3d 322 (1981); *In re Edmonds*, 85 Ill. App. 3d 229 (1980); *In re Austin*, 61 Ill. App. 3d 344 (1978). See also *In re A.H.*, 215 Ill. App. 3d 522 (1991); *In re S.D.*, 213 Ill. App. 3d 284 (1991); *In re R.M.B.*, 146 Ill. App. 3d 523 (1986). These courts have reasoned that section 1(D)(m) sets forth a minimum period of time the State must wait before filing a petition alleging unfitness. The section, however, does not preclude consideration of evidence regarding the parent's conduct following expiration of the 12-month period. It is in the best interests of the child to allow the trial judge to consider all probative evidence in determining the parent's fitness.

*In re R.S.*, 174 Ill. App. 3d 132, illustrates the position of these courts. R.S. was adjudicated dependent on March 19, 1985. The State filed a supplemental petition to terminate the mother's parental rights on June 16, 1987. At the hearing on the State's petition, the trial court considered evidence of the mother's parenting efforts and progress during a period which began with the adjudication of dependency and extended beyond the 12-month period. The trial court found the mother to be

unfit. On appeal, the mother argued that only the 12 months immediately following the adjudication of dependency could be considered under section 1(D)(m). In rejecting the mother's contention, the court observed:

"The language of subsection (m) is ambiguous in defining the role of the designated 12-month period. The statutory language is equally capable of at least two interpretations, including those of the parties. The mother's view is that a court's determination of unfitness under that subsection must be based on parenting efforts or progress during the period beginning with the relevant adjudication and ending 12 months thereafter. The State's view is that at any time at least 12 months after the relevant adjudication, a court may determine unfitness under subsection (m), based upon a parent's parenting efforts or progress during the entire period between the adjudication and the filing of the termination petition; the length of that period is not limited by the statute. It is a basic tenet of statutory construction that if the statutory language is ambiguous, it must be interpreted to carry out the purpose of the statute. [Citation.]
\*\*\*

Given the nature of the Act generally, and of subsection (m) particularly, we reject the mother's and accept the State's interpretation of subsection (m). When more than 12 months have passed after an adjudication of a child's neglect or dependency and the child has not been returned to the parent, if the State alleges a parent's unfitness under subsection (m), it is clearly in the best interest of the child to consider the parent's conduct during the entire post-adjudication period. Further, not merely evidence indicating unfitness need be considered; probative evidence favorable to the parent's progress would also be entitled to consideration." *In re R.S.*, 174 Ill. App. 3d at 133-34.

The court found support for this interpretation in the 1977 enactment which shortened the designated period in subsection (m) from 24 months to 12 months. The court stated:

"Considering the purpose of the Act, the legislature could not have intended, as the mother would suggest, for that

amendment to shorten the period from which evidence could be considered. Rather, the legislature must have intended to shorten the removed child's period of uncertainty—that period during which he is removed from his parent but not eligible for adoption. It accomplished that goal by lessening the time which must pass following the child's removal, before his parent could be found unfit under subsection (m). [Citation.] The designated time period of subsection (m) reflects the rehabilitation period before which unfitness may not be proved under that provision; it does not terminate the period from which evidence may be considered." *In re R.S.*, 174 Ill. App. 3d at 134.

Consider a parent who makes some effort to correct the condition which led to the child's removal or makes some progress toward the return of the child during the 12-month period following the adjudication of neglect, but who discontinues these efforts or actually regresses after the end of the 12-month period. At the time of the hearing, there may be no question that the parent is actually unfit. Should the trial court disregard the parent's current status and base its determination on the progress of the parent during the 12-month period? Or should the court look at the entire post-adjudication period to determine whether the parent's progress, begun in the 12-month period, is actually reasonable? Prior to today, several panels of our appellate court have held that the trial court should consider all relevant evidence of the parent's present fitness. What happens after today if the parent's conduct during the 12-month period will not support a finding of unfitness under section 1(D)(m), but the court is aware that the parent is not able to care for the child? Does the child stay in foster care indefinitely? In *In re M.S.*, 210 Ill. App. 3d 1085, as in *In re R.S.*, the respondent argued that only the first 12-month period after M.S.'s adjudication as an abused and neglected minor was relevant to her alleged failure to make reasonable progress toward the return of M.S. The

majority's holding would require that the trial courts in *In re M.S.* and *In re R.S.* ignore relevant, updated evidence of the parents' unfitness, possibly forcing the trial courts to keep the children in foster care until such time as the State could identify and prove other grounds to support a finding of unfitness.

In the present case, the State argues that the legislature has implicitly endorsed the interpretation given to the provision by the panels of the appellate court. I agree. The legislature has amended section 1(D)(m) to shorten the applicable time period (the time period is now nine months) but has not seen fit to make any other changes to the section. Citing *In re M.C.*, 201 Ill. App. 3d 792, and *In re E.J.F.*, 161 Ill. App. 3d 325 (1987), the majority states that other appellate court cases have held that section 1(D)(m) limits the evidence that may be considered in determining parental fitness. The majority reasons that "the legislature's recent action could equally signify satisfaction with that group of decisions." 191 Ill. 2d at 12. In *In re E.J.F.* the trial court adjudicated the minor dependent and abused on December 26, 1985. The trial court held a hearing on January 20, 1987, to terminate parental rights. The minor's mother argued that the time she spent incarcerated should not be counted in computing the 12-month period under section 1(D)(m). The appellate court rejected this argument, and observed that 12 months is a reasonable period to wait for a parent to make demonstrable progress before a finding of unfitness can be made. The appellate court was not asked to determine whether section 1(D)(m) limits the evidence that may be considered in a fitness hearing. Indeed, the termination hearing followed so closely the end of the 12-month period it is doubtful the parties could have presented evidence beyond the 12-month period.

Likewise, *In re M.C.* does not support the majority's

position. In *In re M.C.* the trial court entered a finding of neglect in December 1985. On June 26, 1989, the trial court held a hearing on the State's petition to declare the minor's mother unfit. The trial court's finding of unfitness was upheld by the appellate court. That court observed:

> "After reviewing the evidence presented regarding [the mother's] conduct contained in the record, it is clear that [the mother's] efforts and progress decreased between 1986 and 1989, since her visits within [*sic*] M.C. lessened and she ceased to participate in any drug treatment program. The record sustains the trial court's finding that [the mother] failed to make reasonable efforts to correct the conditions which caused M.C. to be removed and that [the mother] failed to make progress towards M.C.'s return within 12 months from June 6, 1986, the date of adjudication of neglect." *In re M.C.*, 201 Ill. App. 3d at 798.

In considering evidence of the mother's conduct between 1987 and 1989, both the trial court and the appellate court necessarily found that section 1(D)(m) does not limit evidence of the parent's conduct to the 12-month period following the adjudication of neglect.

Finding no support for the majority's position in *In re M.C.* and *In re E.J.F.*, I must disagree with the majority's contention that a group of appellate court cases has held section 1(D)(m) limits the evidence that may be considered in determining parental fitness. I must also disagree with the majority's conclusion that the legislature's action "signified satisfaction with that group of decisions." Prior authority uniformly contradicts the majority's position.

Where a statutory provision is ambiguous, it is appropriate to examine the legislative history. *People ex rel. Baker v. Cowlin*, 154 Ill. 2d 193, 197 (1992). As the court held in *In re R.S.*, section 1(D)(m) is subject to at least two interpretations. Thus, a review of the legislative history of the Adoption Act is appropriate. Such a review demonstrates that the time period in section 1(D)(m) is

not a limitation on the evidence that may be considered by the trial court in ruling on the parent's fitness. In 1997, the legislature amended section 1(D)(m) to shorten the applicable time period from 12 months to 9 months. See 750 ILCS 50/1(D)(m) (West 1998). The legislative debates on the amendment reflect the concern that children were kept overlong in a state of uncertainty, having been adjudicated neglected or abused but not eligible for adoption because the rights of their parents had not been terminated. The legislature attempted to curtail delays occasioned by the failure of all parties to participate in the court proceedings:

"Cross: *** One of the sections you have, Representative, deals with... provides that counsel appointed for the minor and indigent party shall appear at all stages of the trial proceedings. What's the rationale behind that?

* * *

Dart: Tom, what it is, is in some of the downstate counties there's problems because a lot of the attorneys for the children are excused from the proceedings and so they aren't there for the permanency hearing. And if we're trying to expedite things to get there, it's going to be required that they're involved with it.

Cross: If I re... I remember one of the complaints I heard, was that we were constantly continuing cases because you had different players there...

Dart: Exactly.

Cross: ... and you couldn't get anything accomplished."

90th Ill. Gen. Assem., House Proceedings, April 24, 1997, at 175-76 (statements of Representatives Cross and Dart). The legislature was particularly frustrated with the ability of certain parents to prolong court proceedings while refusing to take the necessary steps to progress to reunification. The amendment shortening the time period from 12 months to 9 months took aim squarely at those parents. At the same time, the legislature recognized the importance of the parent-child relationship, and expressed its determination not to terminate the parental rights of those parents willing to work with the

courts and the Department of Children and Family Services (DCFS) to regain custody of their children:

"Davis, M.: Now how long, how long would it take for a person to lose their parental rights? In other words, let's say I'm an unfit parent and my children are with DCFS, they're in foster care. How long must they be in foster care before the determination is made or even an investigation is made to classify me as an unfit parent?

Dart: Well, it would depend on the individual case, because some parents, frankly, are doing all they can to get their child back. And for those individuals, a termination proceeding would probably go on and eventually not proceed. It would not go ahead. But then there's parents who just aren't doing anything. Who have no concern about the child. Have not showed up in court, aren't involved. Aren't doing anything. For them we've tried to tighten the time line on that, to move that into a 12 month period. The reality of it is though for individuals who are, have had their children taken away, we really aren't changing that in the sense that if they're going along with the case plan. If the case plan says, 'Mom, you have to go to drug rehab, Mom you have to go to parenting classes,' and Mom is doing all of those, *there's no time line saying, 'well, Mom, you didn't do it quick enough.'* If Mom's going along with the case plan, Mom's fine.

Davis, M.: Does your Bill say that? Does your Bill say that if a parent is following, I guess, a court prescribed rehabilitation plan then your children, you won't be losing parental rights. Is that correct?

Dart: Correct, correct. This is the, the heart of this Bill, frankly, is to get after the parents who are in default. The ones who want nothing to do with the child. They've showed no interest. Who once in a while decide to show up. Slow the proceedings down and lead to a situation that we have right now in Cook County where we have 40 thousand children in foster care, who have no permanent setting right now, who are bouncing around in foster homes. What we're trying to do is get at the ones who are showing no interest at all.

\* \* \*

Dart: \*\*\* We're concerned about those kids that are

lingering in foster care situations, primarily in non-relative situations where you have individuals who the parent, once again, is showing no interest in it all and is not involved with the child, does not want to do anything that the department or the court is putting forth.

Davis, M.: *** I personally have a problem deciding that a parent should no longer have parental rights, and the reason I'm saying that is because we hear of cases where a person is perhaps addicted to drugs for a very long period of time. But at some point when the services are available, they turn their lives around and sometimes just the possibility of getting their children back or retrieving them and having a family unit. It becomes an impetus for them to turn their lives around ***. I believe that our Body is very knowledgeable. We study issues. But I just, I'm very concerned when our attempt is to abolish parental rights.

Dart: That's not what we're trying to do.

Davis, M.: But that's a big step. Do you know that's a major step to take?

Dart: Oh yes, I understand it very, very well from dealing with these folks I've worked with for about four and a half years now, visiting children in foster care around the state and seeing these children's lives who are being destroyed by the fact that their parents have no concern with them. As for the parents that you are talking about, who are involved with the programs, are getting their act together, this Bill does not affect them." (Emphasis added.) 90th Ill. Gen. Assem., House Proceedings, May 22, 1997, at 6-9 (statements of Representatives Davis, M., and Dart).

"Schakowsky: I also, I heard you talking to someone about drug addicted mothers. If they are making a good faith effort toward treatment, are they not subject to this?

Dart: Correct. We're not, we're not touching them at all. The problem has been as I mentioned before with the system is, we have these children languished in the system because we have frankly, people know the system and play the system who show no interest in the children who appear once in a blue moon then don't follow through on a case plan. They come back for another petition against them and they don't follow through on that either. If an individual is showing their interest in the child and following

through with this program, they're not affected by this Bill.
***

Dart: *** And I think we ought to look at it to look at it from a fiscal standpoint, the quicker a child is put back in with his original birth parents, it saves everyone a lot of money. So, not only, I think, by just on the moral argument of keeping child together with their family, does the department operate that way. But also when you look at the fiscal reasons, the quicker the child's back in that setting the better." 90th Ill. Gen. Assem., House Proceedings, May 22, 1997, at 16-18 (comments of Representatives Schakowsky and Dart).

Thus, while attempting to deal with the delays in court proceedings and attempting to shorten the period of uncertainty for children in foster care, the legislature struck a balance between the rights of the children in foster care and the rights of parents seriously concerned with the welfare of their children. Those parents willing to work toward reunification are given the opportunity to do so. Those parents with little concern for the welfare of their children have a shortened period of time in which to prove otherwise. The legislation gives the courts and DCFS the flexibility to work with concerned parents as well as the flexibility to expedite termination proceedings for parents unwilling to expend the effort to comply with plans for reunification. The balance struck by the legislature also recognizes the fiscal practicalities involved in foster care. The State's burden in caring for its foster wards is less if the State is able to rehabilitate the natural parents and return the foster wards to their parents' care.

In the present case, the majority limits the evidence at the fitness hearing to conduct of the parent within 12 months following an adjudication of neglect. To do so is to disregard the balance achieved by the legislature between the rights of the child and the rights of the parent. A parent willing to work with the court and DCFS must

be afforded time to comply with any requirements and plans set forth by the court and DCFS, and to progress to reunification.

The majority's approach is also impractical in light of the other statutory provisions governing a determination of unfitness. Section 1(D) sets forth numerous grounds upon which a finding of unfitness may be based. With few exceptions, these grounds do not contain time limitations. Thus, a petition which alleges unfitness due to a parent's failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare would not be subject to any evidentiary time limitation. See 750 ILCS 50/1(D)(b) (West 1994). If such a petition further alleges unfitness under section 1(D)(m), the trial court would be required to consider evidence of the parent's conduct between the adjudication of neglect and the date of the fitness hearing in determining parental fitness under section 1(D)(b), but not under section 1(D)(m). The trial court's determination under section 1(D)(m) would be limited to the parent's conduct within 12 months of the adjudication of neglect even though the balance of the evidence presented to the court might show that the parent had made reasonable progress toward the return of the child, or, conversely, that the parent had regressed and had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent.

The majority believes that limiting the trial court to consideration of conduct within the 12-month period will shorten the period of time children stay in foster homes. The majority directs "the courts below to consider, in an expedited manner, cases involving children like D.L., so that the minors whose futures are at stake in these proceedings can obtain a prompt, just, and final resolution of their status." 191 Ill. 2d at 13. Although the majority's goal is laudable, I do not believe this goal can

be achieved by forcing an early termination of parental rights. I imagine that the timing of the State's petition to find the parent unfit has more to do with the State's determination that a parent is actively cooperating with the court and the State to regain custody of the child and with the possibility of adoption than anything else. Until the State has identified a person willing to adopt a foster child, is it actually in the child's best interest to terminate parental rights? Should the State concentrate its efforts on rehabilitation of the child's natural parents or on court proceedings to terminate parental rights in the anticipation of eventual adoption? Where a parent makes the effort, although after the 12-month period has expired, to correct the conditions that led to the child's removal, should the court ignore her effort and find her unfit based on her conduct during the 12-month (now 9-month) period?

The legislature has provided that the trial judge is to make a "finding" regarding unfitness. The trial judge should be able to consider all relevant evidence in making its finding. In the event that the fitness hearing takes place more than 12 months after the adjudication of neglect, the trial judge has access to additional evidence in determining the parent's fitness. The parent may or may not benefit from consideration of the additional evidence, but surely the child will.

Like the majority, I recognize that many children are kept in foster care too long. Our legislature has addressed the delays in the foster care programs by "lessening the time which must pass following the child's removal before his parent could be found unfit." *In re R.S.*, 174 Ill. App. 3d at 134. At the same time, the legislature has recognized that a parent willing to work with the court and DCFS toward reunification must be afforded the time to do so. Further, the legislature has recognized that it is in the best interests of the child and of the State to

promote reunification where possible. This court should not substitute itself for the legislature just because we are aware a problem exists. In our rush to assuage the problem we may well upset the delicate balance orchestrated by the legislature.

I concur in the result reached by the majority opinion but not in its reasoning.