2022 IL App (2d) 210577-U
No. 2-21-0577
Order filed February 24, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* S.F., | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| a Minor. | ) | |
| | ) | No. 20-JA-42 |
| | ) | |
| | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Latoya E. | ) | Christopher Morozin, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding respondent mother unfit and terminating her parental rights.

¶ 2    Respondent, Latoya E., appeals from the judgment of the trial court, which found her unfit and terminated her parental rights. She asserts that both findings were against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Latoya is the mother of S.F., who was born in January 2014. This appeal concerns only Latoya's rights to parent S.F.; neither the minor's father nor her siblings are at issue.

¶ 5    In December 2014 a call was made to the Department of Children and Family Services (DCFS) reporting injuries to then-two-year-old C.F., S.F.'s older brother. C.F. had two black eyes and bruises on his forehead. Latoya admitted that she caused C.F.'s injuries, stating, "He kept doing stuff he wasn't supposed to[ ]." It was also reported that Latoya was giving S.F. sedatives "to force her to sleep through the night." At the time, S.F. was 11 months old.

¶ 6    Latoya soon failed to cooperate with the investigation; she failed to return C.F. to Illinois from Wisconsin, and removed S.F. from the state, to avoid DCFS investigators. Once the children were located, DCFS took protective custody of them. The State filed a neglect petition and the trial court granted temporary guardianship of C.F. and S.F. to DCFS.

¶ 7    In April 2016 Latoya stipulated to the allegations in the State's petition. In June 2016 the trial court found Latoya dispositionally unfit, and made S.F. a ward of the court.

¶ 8    DCFS then issued Latoya a service plan, which required Latoya cooperate with DCFS and its contract agency in Lake County, One Hope United. Latoya was also required to seek and maintain adequate living arrangements for the minor, and successfully complete programs including anger management, a psychological evaluation, parenting classes, a parenting capacity assessment, a domestic violence assessment, and comply with a medication management plan.

¶ 9    Less than one month later, in July 2016, Latoya was arrested in Lake County and held at the county jail on multiple charges, including burglary and a parole violation. The following month, Latoya was charged with armed robbery and attempted armed robbery in Kenosha County, Wisconsin. The indictments alleged that Latoya and an accomplice robbed two separate Burger King restaurants in Kenosha on the same day. In January 2017 Latoya was transferred to the Illinois Department of Corrections (IDOC), Logan Correctional Center in Illinois, to serve out her 40-month sentence for burglary, which included day-for-day good-conduct credit. While in IDOC

custody, Latoya was brought to Wisconsin and pled guilty to both charges on June 1, 2017. The circuit court in Kenosha County sentenced Latoya to two concurrent nine-year terms. On May 30, 2018, Latoya was discharged from IDOC custody and began serving her sentence in Wisconsin at Taycheedah Correctional Institution (TCI) in Fond du Lac, Wisconsin. She has resided there ever since.

¶ 10    The record contains three service plans and evaluations, completed on November 28, 2016, May 29, 2019, and November 25, 2019. All of the plans were rated unsatisfactory because, *inter alia*, Latoya's incarceration prevented her from obtaining suitable housing for S.F.

¶ 11    On February 10, 2020, the State filed a petition to terminate Latoya's parental rights. The petition alleged that Latoya was unfit on three grounds under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). Counts I and II alleged that Latoya failed to make reasonable progress during two separate nine-month periods following the dispositional order. *Id.* § 1(D)(m)(ii). Count I alleged Latoya failed to make reasonable progress from June 10, 2016, to March 10, 2017, and count II alleged Latoya failed to make reasonable progress from March 3, 2019, to December 3, 2019. Count III alleged Latoya was unfit because:

"[(1)] The child is in the temporary custody or guardianship of the Department of Children and Family Services, [(2)] the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, [(3)] the parent has been repeatedly incarcerated as a result of criminal convictions, and [(4)] the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." *Id.* § 1(D)(s)

¶ 12    Through counsel, Latoya filed an answer to the State's petition. With respect to the "repeated incarceration" count, Latoya admitted the first three elements, but denied the fourth

stating that she "is capable of [parenting S.F.] while incarcerated by and through members of her family."

¶ 13    On December 8, 2020, a hearing began on Latoya's unfitness. The State's first witness was Latoya, who testified via video from TCI. Latoya testified that her Wisconsin sentence was nine years, but stated that she "can get out in two years." When asked to clarify, Latoya stated that her projected parole date was "2025, but [that she] can get out in 2023. Latoya acknowledged that she had been in continuous custody since July 2016.

¶ 14    Latoya was asked if she had been in the Lake County jail for domestic battery to S.F.'s father from January 2015 through October 2015, and she responded, "I don't think so." Latoya said that she thought her sentence was for "[l]ike 40 days." (Latoya pled guilty to domestic battery, which was enhanced to a felony based on a prior domestic battery conviction, in exchange for a sentence of 180 days in jail and 24 months' probation. We affirmed her conviction and sentence. *People v. Latoya E.*, No. 2-16-0250 (2018) (summary order).)

¶ 15    When Latoya was asked if domestic battery was the reason DCFS began investigating her family, she did not answer the question but said, "[t]hat was in 2012 with [C.F.] and then it was 2015—well I had got [C.F.] back within that six months after 2014 or in 2014. And then they end up taking him, again, six months after that."

¶ 16    The trial court then queried Latoya about her convictions and release date. Latoya stated that on August 12, 2025, she would be released on parole. Latoya again stated that she could be released in 2023 because "they" were sending her "to a program in 2022."

¶ 17    Jazmin Ortiz testified that she was the caseworker from 2019 through 2020. Ortiz testified that S.F.'s case had been open since 2014. Ortiz explained that each of respondent's service plans were rated unsatisfactory because she had failed to acquire and maintain suitable housing for S.F.

Ortiz also testified that Latoya had not had a visit with S.F. since the time Latoya was incarcerated in July 2016. Ortiz stated that it was against DCFS policy to transport the minor out of state for visits.

¶ 18    In addition, Ortiz stated that although Latoya had not completed most of the goals of her service plans, Latoya did take a mental health assessment, which diagnosed Latoya with schizophrenia, depression, posttraumatic stress disorder, and bipolar disorder. Ortiz opined that Latoya was not able to cope with her mental health problems, and had yet to complete a parenting capacity assessment. Ortiz had received several letters from Latoya for S.F.; however, some were withheld as inappropriate because Latoya wrote that DCFS "wanted to take" S.F. from her. As a result of the foregoing, Ortiz found that S.F. was confused about who Latoya was and what Latoya's role would be.

¶ 19    Documentary evidence was admitted and the State rested. Latoya testified that she had requested parenting classes, domestic violence classes, and visitation, but had been denied due to her out-of-state incarceration. Latoya stated that she completed a domestic violence counseling in the Lake County jail. Latoya also had suggested that DCFS place S.F. with maternal relatives, but that DCFS did not do so. She also claimed that she sent 60 to 70 letters to S.F. during the pendency of the case. Latoya felt that caseworkers were not "doing their jobs." Latoya rested.

¶ 20    Monica Rodriguez, S.F.'s current case worker was called in rebuttal. Rodriguez testified that she never received a certificate of completion for domestic violence counseling from Latoya, but she had received certificates for parenting and anger management classes. Rodriguez noted that she had received two or three of Latoya's letters for S.F., but they, too, were withheld because they stated that Latoya had "bad dreams" that S.F.'s foster mother would hurt her. Latoya also

encouraged S.F. to run away from her foster home and "go look" for Latoya. As a result of the letters, DCFS determined that online visitation with S.F. would not be appropriate.

¶ 21    Ortiz was recalled and testified that she investigated the placements Latoya had suggested and found that none were suitable. Instead, she said the agency determined that it was preferable to place S.F. in the same foster home as C.F., who had already been adopted by the foster parents. When asked about the letters, Ortiz recalled that some of them referred to caseworkers and the court as "liars" who were attempting to "take" S.F. away.

¶ 22    On May 25, 2021, the trial court found Latoya unfit on each of the three counts. The court made extensive factual findings, including that the caseworkers testified credibly and that Latoya's testimony was not credible. Furthermore, the court found that Latoya's letters to S.F. demonstrated "a lack of good parenting [skills]" and that there was a "lack of relationship" between S.F. and Latoya. While the court noted that it felt DCFS could have done more to facilitate visitation between Latoya and S.F., there was simply no emotional bond between S.F. and Latoya. The court noted that Latoya had achieved very few of the goals in service plans and simply was not in a position to care for S.F. presently or in the near future, even if Latoya was granted early release in 2023.

¶ 23    With respect to Latoya's repeated incarceration, the court stated as follows:

"The Court finds that the criminal convictions entered and her incarcerations had prevented her and will prevent her from discharging her parental responsibilities to [S.F.]

[Latoya] is just not able to provide for the minor's needs, and it has been going on for quite some time. She hasn't been able to be a parent. The convictions have prevented her from being a parent and provide the necessary emotional support and financial support

and stability a child needs. Therefore, the Court finds the State has met its burden of proof by clear and convincing evidence ***."

¶ 24    On July 8, 2021, Latoya filed a motion to reopen proofs concerning her release date. The trial court granted the motion, and Latoya testified that she was accepted into an early release program and, unless she "got in trouble[,]" she could be paroled in July 2022. She stated that she would seek to have her parole transferred to Illinois and to have guardianship and custody of S.F. restored. The trial court found that this testimony was not relevant to its reasonable progress findings and did not alter its conclusion that Latoya's repeated incarceration prevented her from parenting S.F.

¶ 25    On September 15, 2021, a best-interests hearing was held. The court heard from S.F.'s court appointed special advocate (CASA), who stated that S.F. was placed in the same foster home as her brother back in December 2015 and S.F. was now seven. The foster family had adopted C.F., and S.F. shared a room with two additional foster sisters. S.F. was closely bonded with her foster parents, whom she called "Mom" and "Dad," as well as her foster siblings. All of S.F.'s needs were being met. S.F. also attended family gatherings and outings with her foster parent's relatives, and enjoyed taking trips to water parks and zoos. S.F. was also given lots of toys and books, lived in a safe home, and was doing well in second grade. S.F.'s foster parents were committed to adopting her. Rodriguez also testified consistent with the CASA caseworker.

¶ 26    The trial court noted that S.F. had been placed with her foster family for 5½ years and was strongly bonded with her foster family. The court found that it was in S.F.'s best interests to terminate Latoya's parental rights. Latoya timely appealed.

¶ 27                                II. ANALYSIS

¶ 28    On appeal, Latoya challenges the trial court's unfitness and best-interests findings. We will address each contention in turn.

¶ 29    At any time after the entry of the dispositional order, the State may file a petition requesting termination of parental rights. 705 ILCS 405/2-13(4) (West 2012); *In re Brandon A.*, 395 Ill. App. 3d 224, 234, 334 (2009). Thereafter, the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) provides for the termination of parental rights in a two-step process. "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998))." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). After finding the parent unfit, the court next considers whether it is in the best interests of the child to terminate parental rights. *Id.* We will reverse an unfitness or best interests finding if and only if the trial court's determination was against the manifest weight of the evidence, *i.e.*, if the opposite conclusion was clearly apparent. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 17.

¶ 30    Here, as the State notes, Latoya was found unfit on three grounds, as she was found unfit in relation to two separate nine-month periods, as well as on the basis of her repeated incarceration. In addition, as the State also notes, we may affirm a finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period (*In re J.L.*, 236 Ill. 2d 329, 340 (2010)) or on any other ground supported by the record. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006); *In re C.W.*, 199 Ill. 2d 198, 210 (2002) (any one ground, properly proven, is sufficient to enter a finding of parental unfitness).

¶ 31    We first address the repeated incarceration count under section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s)). In assessing this count, courts are to " 'consider the overall impact that repeated incarceration may have on the parent's ability to discharge his or her parental responsibilities *** , such as the diminished capacity to provide financial, physical, and emotional

support for the child.' " *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005) (quoting *In re D.D.*, 196 Ill. 2d 405, 421 (2001)); see also *In re M.C.*, 2018 IL App (4th) 180144, ¶ 25. " 'This ground for unfitness may be utilized regardless of [a parent's] efforts, compliance with DCFS tasks and satisfactory attainment of goals, or the amount of interest [s]he has shown in [the minor's] welfare.' " *Id.* ¶ 26 (quoting *In re M.M.J.*, 313 Ill. App. 3d 352, 355 (2000)). Furthermore, the repeated incarceration need not take place during the child's lifetime (*In re D.D.*, 196 Ill. 2d at 419), though here it did.

¶ 32    Latoya contends that DCFS prevented her from discharging her parental responsibilities because it did not facilitate visitation between her and S.F. Like the trial court, we, too, have concerns about the lack of visitation. However, we cannot compel DCFS to change its policy regarding out-of-state visitation, which was, at least, applied fairly in this case. See, *e.g.*, *In re C.H.*, No. 4-11-0051 at *3 (2011) (unpublished order under Supreme Court Rule 23) (noting DCFS policy). That said, we also agree with the trial court that DCFS's decision to eschew online visitation, or visitation altogether, became reasonable considering the inappropriate content of Latoya's letters.

¶ 33    While the lack of visits was concerning, visitation would not have altered that outcome on this count. As one court has noted, "[b]eing a parent involves more than attending a few visits and sending an occasional [card] to the child. The child needs a positive, caring role model present in her life. [Citation.]" (Internal quotation marks omitted.) *In re M.C.*, 2018 IL App (4th) 180144, ¶ 26. That could not happen for S.F. because of Latoya's fairly serious crimes and her resulting incarceration. Latoya was convicted of three separate felonies during the pendency of this case, and received significant sentences, which has kept her away from S.F. for *years*. That is a significant amount of time in a young child's life. The last time S.F. saw Latoya was July 2016,

just prior to her arrest. In other words, the lack of visitation did not prevent Latoya from discharging her parental responsibilities; her repeated incarceration did.

¶ 34    Moreover, we categorically reject the suggestion in Latoya's answer that her parental responsibilities could be discharged "by and through members of her family." It is axiomatic that parental rights are personal rights and are not fungible. Consequently, parental *responsibilities* are non-delegable and may only be discharged *by parents*. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of *natural parents* in the care, custody, and management of their child" (emphasis added)). Accordingly, we agree with the trial court that the State presented clear and convincing evidence that Latoya's repeated incarceration prevented her from parenting S.F.

¶ 35    Although we need not discuss the reasonable progress counts, the trial court's findings on those counts were amply supported by the evidence. Reasonable progress is measured by an objective assessment of a parent's progress in a given nine-month period toward reunification with the child. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Within the two identified nine-month periods—June 10, 2016 to March 10, 2017, and March 3, 2019 to December 3, 2019—Latoya was incarcerated, and while she took some modest steps towards achieving the goals in her service plan, there was never a time where it was likely the court could order that the child be returned home in the "near future." See *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. In sum, the trial court did not err in finding Latoya unfit.

¶ 36    Having affirmed the trial court's unfitness findings, we now turn to best interests. Once a trial court has found a parent unfit, considerations regarding parental rights yield to the best interest of the child. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 42. The court must consider a number of statutory factors in the context of the child's age and developmental needs, including

physical safety and welfare, familial and community ties, and the least disruptive placement. 705 ILCS 405/1-3(4.05)(a-j) (West 2018). The trial court's decision on best interests is also reviewed under the manifest-weight standard. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 37    We could find Latoya's claims on this issue forfeited. Latoya's only argument is that "[t]here should not have been a best[-]interests hearing because Latoya should not have been found unfit." Latoya asserts that she is due "potentially soon to be released" the court should have changed S.F.'s permanency goal to substitute care pending a determination on parental rights. The assertion, for which she cites no authority, is not well taken.

¶ 38    Our supreme court has recognized that keeping a minor's status in limbo for an extended period of time is categorically not in the child's best interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000). This abuse and neglect case was opened in December 2014 and was not concluded until October 2021. Meanwhile, as noted, Latoya has been incarcerated since July 2016 and she made minimal progress towards reunification when she was out of custody. Her argument is not based on any of the statutory factors. Moreover, Latoya neglects to consider the S.F.'s strong interests in remaining with her foster family, where she has resided for the last 5½ years. We agree with the trial court that S.F.'s best interests are served by having her remain with her foster parents, biological sibling, and foster siblings. S.F.'s foster family is committed to her permanency and remains her best option for a safe, stable, loving home. Latoya's argument to the contrary is unpersuasive.

¶ 39    There is one final matter. S.F. has been under the court's protection since December 2014, when she was 11 months old. Latoya was found dispositionally unfit in June 2016. Then, Latoya was arrested in July 2016, began serving a 40-month sentence for burglary in Illinois, pled guilty to the armed robbery charges in Kenosha on June 1, 2017, and was sentenced to nine years' imprisonment in Wisconsin. Despite all of that, the State waited almost three years and did not file

its termination petition until February 2020. Certainly, as of June 2017, the State had all of the evidence it needed to file a termination petition. Latoya had three felony convictions by then just during the pendency of this case, which was sufficient for a presumptive case of depravity. See 750 ILCS 50/1(D)(i) (West 2018)). Meanwhile, S.F. had been in the same foster home as her brother, C.F., since December 2015. The record does not reveal any reason for the State's apparent lack of diligence in pursuing termination, and it is not as though visitation was occurring during this time, as we have already discussed. As we said to Latoya, a child should not remain in stasis, and three years is a long time in a young child's life. See generally *In re D.L.*, 191 Ill. 2d at 13. The termination of parental rights is one of the State's most significant exercises of power. The State should use this power with due care and appropriate diligence.

¶ 40                                         III. CONCLUSION

¶ 41     For the reasons stated, we affirm the judgment circuit court of Lake County.

¶ 42     Affirmed.