*In re* K.B., a Minor (The People of the State of Illinois, Petitioner-Appellant, v. Kathleen Crowder, Respondent-Appellee).

Fourth District   No. 4—99—0847

Opinion filed June 30, 2000.

John P. Schmidt, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

William A. Pryor, of Pryor Law Offices, of Springfield, for appellee.

JUSTICE GARMAN delivered the opinion of the court:

On March 18, 1998, the State filed a petition to terminate the parental rights of respondent mother, Kathleen Crowder, to her minor daughter, K.B. Following a hearing, the trial court denied the petition. The State filed a motion to reconsider, which the court denied on October 4, 1999. In July 1999, the State filed a supplemental petition to terminate. That petition was denied following a hearing. The State now appeals. We affirm.

## I. BACKGROUND

In November 1993, the State filed a petition for adjudication of wardship, naming Kevin B. as K.B.'s father and respondent as K.B.'s mother. It alleged that K.B. (born November 21, 1993) was neglected due to an injurious environment, because she was born with cocaine in her system. 705 ILCS 405/2—3(1)(b) (West 1992). An adjudicatory order, entered on February 17, 1994, found K.B. to be neglected as al-

leged in the petition and ordered her placed in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS), with the right to place her with her parents. The trial court entered a dispositional order on March 17, 1994, adjudging K.B. a ward of the court and continuing her custody and guardianship in DCFS. Respondent and Kevin were ordered to cooperate with DCFS and their service plans. The parents were ordered to obtain and successfully complete drug and alcohol treatment as recommended by DCFS.

On January 4, 1996, K.B.'s foster mother, Janice Neal, a DCFS employee, filed a petition for custody of K.B. in cause No. 96—F—2. On Neal's motion, her custody case was consolidated with the instant case.

All proceedings in this appeal concern only the State's two petitions to terminate Kathleen's parental rights.

### A. March 1998 Petition To Terminate

On March 18, 1998, the State filed its first petition to terminate the parental rights of both parents. As to Kathleen, the petition alleged that she was an unfit parent in that she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to K.B.'s well-being (750 ILCS 50/1(D)(b) (West 1996)); (2) failed to make reasonable efforts to correct the conditions that were the basis for removal of K.B. from her custody within 12 months after the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1996)); and (3) failed to make reasonable progress toward return of K.B. to her custody within 12 months of the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1996)).

At a hearing on this petition, DCFS caseworker Robin Rees testified that she was K.B.'s caseworker from December 1996 to April 1997. K.B. was returned to Kathleen in December 1996 and removed by DCFS on February 19, 1997. The reason for the removal involved a neighbor who was causing trouble for Kathleen. Due to this problem, DCFS decided to move Kathleen to another location. During the moving process, Kathleen asked the neighbor to help move furniture. An altercation occurred and "the placement was blown." Kathleen was arrested for endangering K.B.'s life, battery, and resisting a police officer. When K.B. was removed after that incident, she was placed with Lisa Cameron, Kathleen's sister. The purpose of removing K.B. was to place her outside Kathleen's home until an investigation of the incident between Kathleen and the neighbor was completed. A return of K.B. to Kathleen's custody was anticipated. When asked whether K.B. was returned, Rees stated that she was not, because Kathleen

refused DCFS' request to go to relapse prevention counseling. Despite the fact that all criminal charges against Kathleen were dropped the same week that she was arrested, DCFS indicated Kathleen for risk of harm. For this reason and because during the nine-day period from February 19, 1997, to March 1, 1997, Kathleen had not followed through with her relapse prevention counseling, DCFS decided to remove K.B. from Cameron's house and place her with Neal. Due to the fact that Neal is a DCFS employee, the case was transferred from DCFS to Lutheran Child and Family Services (Lutheran Services). This is the normal procedure in such a situation.

Rees stated that following removal of K.B. from Kathleen's home in February 1997, visitation was to be once per week for three hours. Rees supervised some visitation between Kathleen and K.B. in early 1997 while K.B. was living with Cameron. A February 19, 1997, visit was terminated early because Kathleen started making inappropriate statements about Neal. A visit the following week was terminated early because Kathleen upset K.B. by talking about giving K.B. up for adoption. Of the eight visits scheduled from February 1997 until Rees transferred the case, Kathleen missed three visits. Only two visits took place that were not terminated early.

Rees developed client service plans during her ·tenure as K.B.'s caseworker. Two service plans written in March 1997 and May 1997 had a permanency goal of return home. They contained multiple objectives, including requirements that Kathleen (1) continue to avoid exposing herself to potentially dangerous people, (2) continue to avoid resorting to violence to settle disputes, (3) refrain from violating any laws, (4) call the police if she is threatened by another person, (5) agree to cooperate with visits by the caseworker, (6) obtain a psychological evaluation and follow any recommendations for treatment, and (7) complete a drug and alcohol assessment from the Triangle Center and comply with any recommendations. Most of the objectives were rated unsatisfactory. Kathleen obtained the drug and alcohol assessment but did not follow through with recommendations. She met with a counselor one time but refused to continue. When Rees discussed the objectives with Kathleen, she told Rees that she did not need counseling and would not attend. She also said that she would not go back to Triangle Center, because alcohol was not her drug of choice.

Rees testified that Tim Gonzalez preceded her as caseworker. When K.B. was placed with Kathleen in December 1996, the case went to Bridgeway Aftercare. Rees was assigned the case either at that point or in January 1997. When asked whether she knew of any reason why caseworkers changed, Rees stated that it was "just policy and

procedures" that once a child returns home from foster care, DCFS' contracts are with Bridgeway Aftercare. Gonzalez had been the caseworker for the four preceding years, when K.B. was initially taken into foster care. At the time K.B. was returned to Kathleen in December 1996, Gonzalez had rated Kathleen satisfactory on her service plan objectives. Rees agreed that the removal of K.B. from Kathleen's home in February 1997 marked the point at which Kathleen ceased to cooperate and achieve her objectives. Kathleen and Rees worked well together until that time.

Roberta Gaines, former Lutheran Services caseworker, testified that she was K.B.'s caseworker from the end of April 1997 until June 1997. Visits were to take place once a week at Lutheran Services. Kathleen attended most of those visits. Her client service plan objectives during that period were to (1) complete a drug and alcohol assessment through Triangle Center, (2) complete a psychological evaluation, and (3) receive counseling services. Kathleen's position with regard to these tasks was that she had accomplished these same tasks prior to K.B.'s return home and that she would not do them all over again. These tasks had been established to deal with anger-management issues that arose from Kathleen's prior outbursts with previous caseworkers and also to be certain that alcohol was no longer an issue for Kathleen. Gaines was not aware that, under Rees' tenure, Kathleen did obtain a drug and alcohol assessment.

Joseph Anderson, former Lutheran Services caseworker, testified that the client service plans while he was the caseworker all remained the same. Anderson evaluated the service plan in October 1997, more than 30 days prior to the normal evaluation date, because he was leaving Lutheran Services. Kathleen had participated well in visits with K.B. and participated in some counseling. To Anderson's knowledge, Kathleen did not complete any drug or alcohol assessment or any type of treatment. Anderson testified that while he had the case, Kathleen was arrested outside a convenience store and police had to use pepper spray to restrain her. She was charged with resisting a police officer, but the charges were dropped.

Vanessa Taylor, Lutheran Services caseworker, testified that she was assigned K.B.'s case on October 27, 1997, and had continued to the present. Initially, visits with K.B. were on a weekly basis. At an administrative case review (ACR) held on November 21, 1997, which Kathleen did not attend, the permanency goal was changed from return home to substitute care pending court decision. This resulted from a legal screening held on August 5, 1997, at which termination of parental rights was recommended. After the November 21, 1997, ACR, Kathleen's weekly visits were changed to once per month for one hour.

Kathleen had the responsibility to call and arrange for a visit. No visits took place between January 1998 and July 1998. Kathleen made no contact at all with Taylor during that time period. On July 1, 1998, Kathleen called and requested a visit with K.B. Because K.B. was on vacation during July, she was asked to call again near the beginning of August. She did so and a visit was held on August 7, 1998. Another visit was held in September 1998. At that time, Kathleen told Taylor that she was living at McFarland Zone Center. She refused to tell Taylor why she was there. At no time did Kathleen provide any information indicating that she had been working on any of her tasks.

Taylor testified that she did not make any referrals on Kathleen's behalf for services during her tenure as caseworker. Taylor was aware that Kathleen had obtained a drug and alcohol assessment and a psychological evaluation prior to K.B.'s return home in December 1996. When asked why it was necessary for Kathleen to do these tasks again after K.B. was removed in February 1997, Taylor stated that DCFS procedure requires it. Taylor had not visited Kathleen at her home. Taylor sent Kathleen a certified letter in March 1998, asking her to contact Taylor. Kathleen did not respond.

Pam Rouse of Lutheran Services testified that she supervised visits in 1998 between Kathleen and K.B. At first, K.B. did not recognize Kathleen and Rouse had to tell her that Kathleen was her mother. During the visit, Kathleen told K.B. that she had not visited with her because Lutheran Services would not allow it.

Gonzalez, K.B.'s initial caseworker, testified that he was assigned the case at the end of November 1993. He was removed as caseworker at the beginning of February 1997. During his six years as a DCFS caseworker, Gonzalez was involved in hundreds of cases. He thought it unusual that he was removed as caseworker, since there normally would have to be some compelling reason for a caseworker's removal. Neither he nor Kathleen requested his removal. In fact, he objected to it. During his tenure as caseworker, Gonzalez had contact with Neal as K.B.'s foster parent. They spoke or met at least once per month. They discussed service plans, visitation, and the permanency goals. Neal made statements about wanting K.B. to live with her permanently. Gonzalez sometimes had to refocus the discussion on the permanency goal, which was to reunite Kathleen and K.B. Neal later hired an attorney to combat this permanency goal.

Gonzalez testified that for five to six months prior to the time that K.B. was officially returned to Kathleen in December 1996, K.B. was with Kathleen on an unsupervised basis the vast majority of the time. Gonzalez made the recommendation that K.B. be returned home. Kathleen had accomplished the tasks required of her to regain custody

of her child. New tasks were established to allow K.B. to remain home. Between the time K.B. returned home and the time Gonzalez was removed from the case, Kathleen continued to cooperate with him as caseworker. Some of her tasks included remaining drug-free, abiding by the law, maintaining stable housing, and protecting K.B. from individuals who would pose a risk of harm to her.

Kathleen testified that after K.B. was returned to her in December 1996, she did not feel that she needed to complete any further tasks, as she had already done everything required of her to regain custody of her daughter. The neighbor with whom she had trouble lived across the hall from Kathleen. She was hostile to Kathleen and was an alcoholic who had prior dealings with Neal. The neighbor would often get drunk, knock on Kathleen's door late at night, and call Kathleen a "nigger lovin' ho" in front of K.B. After Kathleen moved to her new apartment, the neighbor called police and made a complaint. Police came to her door and took her to jail. No charges were filed against her. After K.B. was returned to foster care, Kathleen stopped her mental health counseling and her attendance at Alcoholics Anonymous/ Narcotics Anonymous meetings. She did not attempt to do any of the things requested by her caseworkers.

Kathleen testified that she attended her visits with K.B. until November 1997. At that time, DCFS decided that, because Neal had put in another request for termination of parental rights, Kathleen's visits would be cut to once a month for one hour. She could not deal with this and so did not attend the November 1997 visit. She did attend the December 1997 visit, but did not attend further visits until August 1998, because she felt that "it was a lost cause." No matter what she did, the result would be the same. Kathleen expressed a willingness to now follow the case plan, despite her feelings that she has completed the tasks before.

Kathleen testified that she had weekly contact with Gonzalez when he was her caseworker. She saw Rees only twice after K.B. was removed from her custody. She saw Anderson once a week, and Gaines and Taylor only one time each. DCFS did not provide Kathleen with any assistance to help her resolve the reason that K.B. was removed from her in February 1997. She continued to follow the case plan until November 1997, when her visitation with K.B. was cut to once a month. She received counseling and maintained her visits with K.B.

At the conclusion of evidence, the trial court found Kevin B. to be an unfit parent. The court took the matter under advisement as to Kathleen. On December 1, 1998, the court entered a written order denying the petition to terminate Kathleen's parental rights. The court found that Kathleen had made reasonable progress toward the

return of K.B. while Gonzalez was her caseworker and the child was in fact returned to her. Several occurrences interrupted that reasonable progress, including the change in caseworkers, Kathleen's arrest, and the November 21, 1997, ACR and corresponding permanency goal change. The court discussed these factors as follows:

"It is abundantly clear that under [Gonzalez'] tutelage, [Kathleen] was making substantial progress toward reunification with her daughter. [Gonzalez] was removed as the caseworker by [DCFS] for reasons unknown and a succession of new caseworkers were assigned. Those new workers demanded that [Kathleen] in effect start over again on her by then [3½-]year effort to regain custody of her child. Many of the tasks set forth by them had already been accomplished and no one could successfully explain to [Kathleen] why they had to be done again. When faced with this bureaucratic imperative, [Kathleen] refused, viewing this demand as a stumbling block intentionally placed in her path toward regaining custody. Without comment on whether [Kathleen] was right or wrong, the Court does find that under these circumstances her refusal was not unreasonable.

In February of 1997, [Kathleen] was arrested for battery and aggravated battery. She was also charged with child endangerment. Even though all of those charges were subsequently dismissed and the limited evidence heard by the [c]ourt would indicate that [Kathleen] was in no way an aggressor in this circumstance, DCFS indicated a report against her. The mother had a difficult time convincing either DCFS or [Lutheran Services] she was blameless in these events.

As [DCFS] continued to believe otherwise, in November of 1997 it changed the goal of this case to one of termination. This caused [Kathleen] to despair and she failed to make several visits. That emotionally [DCFS] may have at this time beaten [Kathleen], this does not result in the [c]ourt finding that her failure to exercise all of her visits constitutes a failure to make reasonable efforts, reasonable progress, or show reasonable interest. Rather, the [c]ourt finds that [Kathleen's] actions or inaction was reasonable under the circumstances.

In sum, [Kathleen] was experiencing more than reasonable progress toward reunion with her child until February of 1997. Thereafter [DCFS'] actions caused an interruption in said progress. Progress has now been restored to the extent that the [c]ourt cannot find that any of the bases for termination of rights as alleged in [p]aragraph 8 of the [p]etition have been proven."

In December 1998, the State filed a motion to reconsider the trial court's denial of its petition. This motion apparently was not set for

hearing until after proceedings resulted in denial of the State's July 1999 petition to terminate. The court heard and denied this motion on October 4, 1999.

### B. July 1999 Petition To Terminate

On July 20, 1999, the State filed a supplemental petition to terminate Kathleen's parental rights. That petition alleged that Kathleen had failed to maintain a reasonable degree of interest, concern, or responsibility as to K.B.'s welfare and that she had failed to make reasonable progress toward the return of K.B. to her custody within 12 months of K.B.'s adjudication as a neglected minor.

At a hearing on this petition, Neal testified that from September 1998 to September 1999, Kathleen had no contact with K.B. outside of that arranged by Lutheran Services. K.B. received a stuffed animal from Lutheran Services that Neal was told came from Kathleen. K.B. received no birthday gifts in November 1998 and there had been no cards or letters. Neal had a birthday party for K.B. in November 1998, to which Kathleen was not invited. Kathleen called twice approximately three months earlier to inquire about K.B. Those two calls are the only times Neal and Kathleen have spoken in two years. Neal acknowledged that she would not have expected Kathleen to initiate contact with K.B. through her. Her relationship with Kathleen has been adversarial during the last three years.

Vanessa White, formerly known as Vanessa Taylor, testified that Kathleen had attended three visits with K.B. since September 1998. They occurred in September 1998, October 1998, and November 1998. A visit was scheduled for August 1999, but Kathleen called and canceled it, saying that she had some errands to run and would not be able to finish in time. She did not call to reschedule the August visit. White sent Kathleen several letters from December 1998 to July 1999, telling her that her parental rights had not been terminated and that Lutheran Services was willing to work with her to get K.B. back. Kathleen advised White that she had received the letters and understood that her rights had not been terminated. Other than the one call in late July 1999 about setting up an August 1999 visit, Kathleen did not respond to White's letters. White talked with Kathleen on the telephone about upcoming court hearings. During those conversations, Kathleen would ask about K.B. Kathleen has not, in the last 12 months, given any correspondence or gifts to Lutheran Services to pass along to K.B. During the last 12 months, Kathleen has not completed any of her service plan tasks, although she did go to Triangle Center in September 1999. Since the goal was termination, DCFS had no duty to provide services for Kathleen after November 1997.

White testified that following the trial court's order denying the petition to terminate parental rights in December 1998, DCFS did not change the permanency goal to return home. The client service plan implemented in November 1998 required Kathleen to (1) obtain a psychological evaluation, (2) complete drug and alcohol treatment at Triangle Center, (3) abide by laws, (4) refrain from exposing herself to dangerous people, and (5) attend visitation with K.B. once per month. From November 1998 to the present, White had not made any referrals for Kathleen for a psychological evaluation or drug and alcohol treatment. White does not know whether Kathleen maintained a safe environment for herself since September 1998, because Kathleen did not contact her. White had not had a current telephone number for Kathleen until three months ago. White also made visits to Kathleen's house in an attempt to contact her, but Kathleen was not present at these times.

White testified that at a permanency review hearing held three months before the hearing on the supplemental petition, Lutheran Services decided to maintain the permanency goal as substitute care pending court decision. This meant the visitation arrangements stayed the same, with Kathleen having to schedule the visits once per month.

Kathleen testified that she had lived in her current residence for the last 1½ years. She also had a post office box and a telephone number. She first learned in July 1999 that the trial court had denied the State's first petition to terminate her parental rights. She received White's letters but lacked the courage to open them. They are still unopened. Kathleen did open one of the letters hand-delivered to her house in July 1999; that is when she learned that her parental rights had not been terminated.

Kathleen called Triangle Center in August 1999 and requested an evaluation. She attended some classes but relapsed by having a drink. She went to detox and stayed for 14 days. She had been on outpatient status since that time. When she called White in July 1999 to schedule a visit, White told her that she would have to wait 30 days because she had not seen K.B. for a while. During that month, she was "shoved" off her front porch and sustained a foot injury. On the day of the scheduled visit in August 1999, she overslept. She called White to see if the visit could be held later in the day, because she had to take the bus to the bank, which is on the other side of town. White declined to change the time and suggested that the visit be rescheduled for the next Friday. By that time, however, Kathleen was on a drinking "binge." She later sought help.

Kathleen testified that she did not attend a scheduled visit on K.B.'s birthday in November 1998. She also did not attend an ACR scheduled for that same day, although she was aware of it.

At the close of evidence, the trial court took the matter under advisement. In a written order entered on September 29, 1999, the court denied the State's supplemental petition. In doing so, the court noted that Kathleen had visited with K.B. in September, October, and November 1998 and sent a Christmas gift to K.B. in December 1998.

## C. Appeals

In October 1999, the State obtained denial of its December 1998 motion to reconsider the court's denial of the March 1998 petition to terminate and filed its notice of appeal on denial of both petitions to terminate parental rights.

## II. ANALYSIS

### A. Standard of Review

Our courts have recognized that parental rights and responsibilities are of deep human importance and thus will not terminate those rights lightly. *In re A.T.*, 197 Ill. App. 3d 821, 825, 555 N.E.2d 402, 405 (1990). Parental rights of a nonconsenting parent may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *In re J.G.*, 298 Ill. App. 3d 617, 627, 699 N.E.2d 167, 174 (1998). In cases involving the termination of parental rights, great deference is given to the trial court, since it had the opportunity to see the witnesses and evaluate their testimony, and that court's decision will not be reversed unless contrary to the manifest weight of the evidence. *In re L.L.S.*, 218 Ill. App. 3d 444, 458, 577 N.E.2d 1375, 1385 (1991). The reviewing court does not reweigh the evidence or reassess the credibility of the witnesses. *In re C.P.*, 191 Ill. App. 3d 237, 244, 547 N.E.2d 604, 608 (1989).

A question arises in this case as to whether the trial court could consider the evidence presented by the State on both petitions as to Kathleen's alleged lack of reasonable efforts and lack of reasonable progress. In *In re Davonte L.*, 298 Ill. App. 3d 905, 699 N.E.2d 1062 (1998), the State filed a petition to terminate the respondent mother's parental rights. Among the grounds alleged in the petition were allegations that the respondent mother had failed to make reasonable efforts or reasonable progress toward a return of the child to her within 12 months of the adjudication of neglect. The evidence showed that the respondent mother failed to make any efforts or progress during the initial 12-month period. Her conduct improved after two years had elapsed from the date of adjudication. The trial court found that the State had failed to establish any of the grounds of unfitness alleged. In doing so, the trial court considered the respondent mother's

conduct during the entire postadjudication period. The appellate court found the trial court's decision was against the manifest weight of the evidence, where the record established that the respondent mother had failed to maintain a reasonable degree of interest, concern, or responsibility toward the child's welfare, failed to make reasonable progress within 12 months of the adjudicatory order and was addicted to drugs for at least one year preceding the commencement of the unfitness proceeding. *In re Davonte L.*, 298 Ill. App. 3d 905, 919-20, 699 N.E.2d 1062, 1072 (1998). The appellate court held that, as to the reasonable progress ground of unfitness under section 1(D)(m) of the Adoption Act, a court may only consider a parent's conduct that occurs within the initial 12-month period following adjudication. Any evidence subsequent to that time period is irrelevant in establishing parental unfitness. *Davonte L.*, 298 Ill. App. 3d at 921, 699 N.E.2d at 1072.

On further appeal, the Supreme Court of Illinois agreed with the appellate court regarding the time limitation set forth in section 1(D)(m) of the Adoption Act. *In re D.L.*, 191 Ill. 2d 1, 10, 727 N.E.2d 990, 994 (2000). In construing section 1(D)(m) of the Adoption Act, the supreme court determined that the plain language of that section mandates a finding that the relevant time period during which a parent's efforts or progress must be assessed and measured is the 12-month period following adjudication. The court also noted that the legislature amended section 20a of the Adoption Act (750 ILCS 50/20a (West 1994)) by adding language stating that it is in the best interests of persons to be adopted that the Adoption Act be construed and interpreted so as not to result in extending time limits beyond those set forth therein. A construction that permits the entire course of a parent's conduct under section 1(D)(m) of the Adoption Act to be considered would be inconsistent with the legislature's expressed intent that the statute not be interpreted in a manner that would extend the time limits established therein. *D.L.*, 191 Ill. 2d at 11, 727 N.E.2d at 995.

Although the respondent mother in *D.L.* raised only the reasonable progress ground of unfitness in her appeal, the supreme court made references to a parent's efforts, as well as progress, in determining that section 1(D)(m) of the Adoption Act limits a court's consideration of a parent's conduct. The court clearly signaled that no distinction is to be made between the two grounds in that section by stating the following:

> "We agree with the guardian and the appellate court below and conclude that section 1(D)(m) of the Adoption Act limits the evidence that may be considered under the provision to matters

concerning the parent's conduct in the 12 months following the applicable adjudication of neglect, abuse, or dependency. The statute plainly states that a parent is unfit if the parent fails to make either reasonable efforts to correct the conditions that led to the child's removal or reasonable progress toward return of the child within 12 months after an adjudication of neglect, abuse, or dependency. Giving effect to the plain language of section 1(D)(m), we conclude that the relevant period of time under this provision, in which the parent's efforts or progress must be assessed and measured, is the 12-month period following the adjudication." *D.L.*, 191 Ill. 2d at 10, 727 N.E.2d at 994.

These statements, insofar as they relate to reasonable efforts, are contrary to the decision of this court in *In re K.B.J.*, 305 Ill. App. 3d 917, 713 N.E.2d 253 (1999), where the State alleged both grounds of unfitness under section 1(D)(m) of the Adoption Act. The trial court found the respondent mother unfit under both grounds. On appeal, respondent mother argued that the trial court could not have considered her progress during the entire 12-month period set forth in that section, because the State filed its petition to terminate parental rights prior to the expiration of the 12-month period. She did not argue that the time limitation applied to the reasonable efforts ground or that the evidence concerning her efforts was inadequate to establish her unfitness. *K.B.J.*, 305 Ill. App. 3d at 920, 713 N.E.2d at 256. This court affirmed the trial court's decision, holding that the reasonable efforts ground was not subject to the 12-month limitation in section 1(D)(m). In so holding, we determined that the legislature's use of the word "or" in the disjunctive signaled a legislative intent that the two grounds be viewed in the alternative. Relying on the doctrine of the last antecedent, we stated that placement of a comma after the word "parent" and immediately prior to the word "or" showed a legislative intent that only the reasonable progress ground was subject to the time limitation. *K.B.J.*, 305 Ill. App. 3d at 922-23, 713 N.E.2d at 257. We also noted that because the reasonableness of a parent's efforts is gauged subjectively, it is not unreasonable to place the burden to make reasonable efforts on the parent at some reasonable time less than 12 months following the adjudication of neglect, abuse, or dependency. *K.B.J.*, 305 Ill. App. 3d at 923, 713 N.E.2d at 258.

Although the statements in *D.L.* regarding the reasonable efforts ground were *dicta*, the supreme court drew no distinction between that ground and the reasonable progress ground, nor did it give any indication that it would not apply the same reasoning to an argument regarding reasonable efforts and the time limitation contained in section 1(D)(m) of the Adoption Act. In fact, the reasoning employed by

*D.L.* applies with equal force to both grounds. *K.B.J.* is inconsistent with this reasoning. See *In re E.B.*, 313 Ill. App. 3d 672, 674 (2000).

B. The State's Initial Petition To Terminate Parental Rights

The State argues that the trial court's decision denying its first petition of March 1998 was against the manifest weight of the evidence. The first petition alleged that Kathleen had (1) failed to maintain a reasonable degree of interest, concern, or responsibility toward K.B.'s welfare, and (2) failed to make reasonable efforts to correct the conditions that resulted in K.B.'s removal from her custody or make reasonable progress toward K.B.'s return to her custody within 12 months of the adjudication of neglected minor.

We note that, as this court stated in *In re D.S.*, 313 Ill. App. 3d 1020 (2000) the statutory period of section 1(D)(m) of the Adoption Act starts on the date that the trial court files its dispositional order completing the adjudication of the minor as neglected, abused, or dependent. Accordingly, that time period, for purposes of both petitions to terminate herein, commenced running on March 17, 1994, and concluded on March 17, 1995. 750 ILCS 50/1(D)(m) (West 1994) (at time of adjudication in this case, section referred to reasonable progress within 12 months).

The State presented no evidence as to Kathleen's progress or efforts during the initial 12-month period following the March 1994 dispositional order that completed the adjudication of K.B. as a neglected minor. The State's evidence commenced with a time period more than three years after K.B.'s adjudication. Accordingly, the State did not prove that Kathleen failed to make reasonable efforts to correct conditions or reasonable progress toward K.B.'s return to her within 12 months of the order of adjudication. Although the trial court erred in considering evidence outside the 12-month period following adjudication, its decision denying the State's petition on these two grounds was correct. We note that we may affirm the trial court's decision on any basis established by the record. *People v. Brownlee*, 186 Ill. 2d 501, 511, 713 N.E.2d 556, 562 (1999).

The State also alleged that Kathleen failed to maintain a reasonable degree of interest, concern, or responsibility as to K.B.'s wellbeing. It relied on Kathleen's failure to comply with DCFS mandates after K.B. was removed from her in February 1997 regarding client service plan objectives that it asked Kathleen to meet. Evidence at the unfitness hearing showed that DCFS sought to require Kathleen to start all over again on the same service plan tasks that she had previously accomplished prior to K.B.'s return to her in December 1996. When asked why this was necessary, White, Kathleen's most recent

caseworker, could only say that this was DCFS' policy when a child is removed after a return home.

Rees testified that, when K.B. was removed from Kathleen's custody in February 1997, K.B. was placed with Cameron and a return to Kathleen was anticipated. However, when Kathleen failed to follow through with relapse prevention counseling, DCFS decided to place K.B. with Neal nine days after K.B.'s removal. No explanation was given as to how relapse prevention counseling related to remedying the problem that caused K.B.'s removal in February 1997. Kathleen became discouraged and refused to comply with her service plan objectives. She did, however, maintain her visits with K.B., which were scheduled once a week for three hours. Rees testified that Kathleen attended five of the eight visits scheduled between February 1997 and April 1997.

Gaines testified that during her tenure as caseworker from the end of April 1997 to June 1997, Kathleen attended most of her visits with K.B. Anderson testified that, between June 1997 and October 1997, Kathleen participated well in visits with K.B. The most recent caseworker, White, testified that, because of the November 1997 change in permanency goal from return home to substitute care pending court decision, Kathleen's visits were changed from once a week for three hours to once a month for one hour. In addition to the drastic change in visitation, Kathleen was required to call to schedule visits. No visits took place between January 1998 and July 1998. Visits were scheduled and attended in August 1998 and September 1998.

In arguing that it proved Kathleen an unfit parent under the lack of reasonable interest ground, the State relies on the lack of visits between January 1998 and July 1998. The trial court criticized DCFS for requiring Kathleen essentially to start over again and complete the same tasks that she had previously completed prior to December 1996. It noted the unexplained removal of Gonzalez, Kathleen's initial caseworker, under whose tutelage Kathleen was progressing toward the return of K.B. The court found that these circumstances caused Kathleen to despair and to abandon her efforts to secure custody of her child. Under these circumstances, we do not find that the trial court's decision on the reasonable interest ground was against the manifest weight of the evidence.

## C. Supplemental Petition To Terminate Parental Rights

A similar analysis applies to the State's July 1999 supplemental petition. In that petition, the State alleged a lack of reasonable interest and a lack of reasonable progress. Clearly, under *D.L.*, the trial court was limited to considering Kathleen's progress or lack thereof

only during the initial 12-month period following the trial court's March 1994 dispositional order. The State presented no evidence as to Kathleen's conduct during this time.

As to the lack of reasonable interest ground, the State relied on Kathleen's lack of contact and lack of visitation with K.B. from September 1998 to September 1999, the date of the hearing on the supplemental petition. The trial court denied the supplemental petition on this ground, noting that Kathleen had attended visits during September 1998, October 1998, and November 1998. The court also found that Kathleen had sent K.B. a stuffed animal in December 1998. We note that Kathleen acknowledged in her testimony that she received letters from White, but stated that she lacked the courage to open them. She testified that when she opened a letter left at her house in July 1999, she learned for the first time that the trial court did not find her to be an unfit parent. Thereafter, she called to schedule a visit for August 1999, but when that was canceled, she did not call again to reschedule the visit.

In *In re Adoption of Syck*, 138 Ill. 2d 255, 562 N.E.2d 174 (1990), the supreme court set forth factors to be considered in determining whether a parent has demonstrated a reasonable degree of interest, concern, or responsibility toward the welfare of her child. Those factors must be examined in the context of the circumstances in which the parent's conduct occurred. When considering whether a parent's failure to visit her child establishes a lack of reasonable interest, concern, or responsibility toward the child's welfare, a court should consider (1) the parent's difficulty in obtaining transportation to the child's residence, (2) the parent's poverty, (3) the actions and statements of others that hinder or discourage visitation, and (4) whether the parent's failure to visit was motivated by a need to cope with other aspects of her life or by true indifference to the child. If personal visits with the child are impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of interest, concern, and responsibility. *Syck*, 138 Ill. 2d at 278-79, 562 N.E.2d at 185.

In accordance with *Syck*, we evaluate Kathleen's conduct in the context of the circumstances in which the conduct occurred. There can be no doubt that Kathleen should have opened the correspondence that White sent to her after the trial court's December 1998 denial of the State's initial petition to terminate parental rights. However, had Kathleen opened the letters, she would have learned that nothing had changed as far as DCFS was concerned. We find it disturbing that DCFS essentially chose to ignore the trial court's December 1998 denial of the State's first petition to terminate Kathleen's parental

rights. White testified that, after the court's decision, DCFS decided not to change the permanency goal from substitute care to return home. It also did not change Kathleen's visitation with K.B. Rather than resume the weekly visits that Kathleen had prior to the November 1997 change in the permanency goal, DCFS simply continued the same monthly one-hour visitation.

In addition, White testified that she made no referrals for services for Kathleen and that she was not required to do so, since the permanency goal was substitute care pending court decision. The trial court had criticized the service plans put in place after February 1997 as not being related to remedying the problem that had caused K.B. to be removed from Kathleen in February 1997. Yet, after the December 1998 order, DCFS made no changes in the service plan tasks to address the trial court's concerns. DCFS' actions since Gonzalez' removal as caseworker suggest a preference that K.B. not be reunited with Kathleen. Compounding the situation is the fact that Neal was apparently working against reunification and had an adversarial relationship with Kathleen. Under these circumstances, it is not surprising that Kathleen did not try to contact K.B. at Neal's home. Neal herself testified that she would not have expected Kathleen to do so. We conclude that the trial court's judgment denying the State's supplemental petition was not contrary to the manifest weight of the evidence.

## III. CONCLUSION

The legislature has revised procedures under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1—1 et seq. (West 1998)) and increased the role of trial courts in following the case after adjudicating a minor neglected, abused, or dependent and entering the dispositional order. In 1993, the legislature amended the Juvenile Court Act to provide for "permanency review hearing[s]" and "permanency goal[s]." Pub. Act 88—487, § 50, eff. September 10, 1993 (1993 Ill. Laws 4263, 4279) (adding 705 ILCS 405/1—3(11.1), (11.2) (West Supp. 1993)). The legislation required the court to set the date for the first permanency review hearing at the conclusion of the dispositional hearing on the petition for adjudication, to be held as specified. Pub. Act 88—487, § 50, eff. September 10, 1993 (1993 Ill. Laws 4263, 4281) (adding 705 ILCS 405/2—22(5) (West Supp. 1993)). The legislature amended section 2—28(2) of the Juvenile Court Act to require the court to conduct permanency review hearings every six months following the initial permanency review hearing, with the court then reviewing such matters as the permanency goal selected by DCFS, the appropriateness of its plan to achieve the goal, whether all parties were

making reasonable efforts to achieve the goal, and whether it had been achieved. Pub. Act 88—487, § 50, eff. September 10, 1993 (1993 Ill. Laws 4263, 4284–86) (as amended, 705 ILCS 405/2—28(2) (West Supp. 1993)). The legislature added to section 2—23 to provide the trial court authority to remand a service plan to DCFS if it deemed it not a reasonable exercise of agency discretion and to hold a new hearing within 45 days of the date of such remand. Pub. Act 88—487, § 50, eff. September 10, 1993 (1993 Ill. Laws 4263, 4282) (as amended, 705 ILCS 405/2—23(3) (West Supp. 1993)). Any permanency review order entered under section 2—28(3) "shall be immediately appealable." Pub. Act 88—487, § 50, eff. September 10, 1993 (1993 Ill. Laws 4263, 4287) (as amended, 705 ILCS 405/2—28(3) (West Supp. 1993)).

In legislation acted on by the General Assembly in May 1997, that body further amended sections 2—28(2) of the Juvenile Court Act to provide that the "court shall set one of the following permanency goals" (Pub. Act 90—28, art. 10, § 10—20, eff. January 1, 1998 (1997 Ill. Laws 1498, 1566 (as amended, 705 ILCS 405/2—28(2) (West Supp. 1997)) (applying to counties with a population under 3 million); *i.e.*, DCFS would no longer set the goal. While this legislation never took effect due to the legislature's unfortunate timing in passing several bills on the same matter in the same session (see *In re J.H.*, 304 Ill. App. 3d 188, 196, 709 N.E.2d 701, 707 (1999)), in 1998, the legislature accomplished its goal (see Pub. Act 90—608, § 30, eff. June 30, 1998 (1998 Ill. Laws 1553, 1617–24) (amending 705 ILCS 405/2—28(2) (West Supp. 1997)); *J.H.*, 304 Ill. App. 3d at 197, 709 N.E.2d at 707). Trial court jurisdiction is continuing in these cases, and matters adjudicated are not *res judicata* to future matters showing change in conditions. See, *e.g.*, *In re S.J.K.*, 149 Ill. App. 3d 663, 670, 500 N.E.2d 1146, 1151 (1986); *In re Johnson*, 102 Ill. App. 3d 1005, 1016, 429 N.E.2d 1364, 1373-74 (1981). The parties are entitled to continuing court supervision and direction. Likewise, we conclude that upon denial of the March 1998 petition to terminate parental rights in December 1998, Kathleen was entitled to have the circuit court conduct a review hearing, specify the goal, and enter appropriate orders in this case. We trust that the trial court will now accord Kathleen a review hearing.

We affirm the judgments of the trial court denying the State's initial and supplemental petitions.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.