THE CITY OF CHICAGO, Plaintiff-Appellant, v. ELEVATED PROPERTIES, L.L.C., a/k/a Elevated Properties, *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—03—2440

Opinion filed October 13, 2005.

Mara Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Meera Werth, Assistant Corporation Counsel, of counsel), for appellant.

Edward R. Vrdolyak, Ltd., of Chicago (Michael P. Casey, of counsel), for appellees.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiff, the City of Chicago (the City), appeals from an order of the circuit court of Cook County, levying fines against defendant, Elevated Properties, LLC, a/k/a Elevated Properties (Elevated), for violations of sections 13—12—125 (Vacant Buildings Ordinance) and 13—12—130 (Unsafe Buildings Ordinance) of the Chicago Municipal Code (Code) (Chicago Municipal Code §§ 13—12—125, 13—12—130 (2000)). On appeal, the City argues that the trial court erred in finding that Elevated had equitable defenses and in refusing to levy the minimum fines required by the Code. For the following reasons, we reverse and remand.

## BACKGROUND

On September 21, 2000, the City filed an 11-count complaint for equitable and other relief against Elevated, unknown owners, and nonrecord claimants for violations of the Code. The complaint described three buildings located on Elevated's property at 3301 East 98th Street in Chicago, Illinois (the Property), which included a 10-story building (Building I), an 8-story building (Building II), and a 1-story building (Building III).

The complaint also described the dangerous conditions allegedly existing in each building and sought injunctive relief and penalties for violations of various sections of the Code. In particular, count II of the complaint sought fines for unsafe conditions on the Property in violation of the Unsafe Buildings Ordinance, section 13—12—130 of the Code. Count IX sought fines for Elevated's failure to register vacant buildings on the Property in violation of the Vacant Building Registration Ordinance, section 13—12—125 of the Code.

Elevated was served with summons on October 3, 2000, and subsequently filed its appearance and answer on October 12, 2000. During the initial hearing on October 12, 2000, Elevated informed the trial court that it had received a $2.4 million estimate to demolish one of the structures on the Property. On January 18, 2001, the trial court entered an order of default against the unknown owners and nonrecord claimants, leaving Elevated as the sole defendant in the suit. A trial was held on September 23 and 27, 2002, during which both sides called witnesses and presented evidence.

At trial, Dennis Callinan, an administrator with the Vacant Multiple Dwelling Registrations Program for the City, testified that Chicago's Building Code requires vacant buildings to be registered with Chicago's department of buildings, and he described the process by which owners can register such buildings. Callinan testified that the purpose of registering vacant buildings, which requires an annual

fee, is to make ownership information available to City inspectors and other officials. Callinan also testified that if a building has never been registered, that fact is indicated in the City's records. Callinan further testified that on September 19, 2002, he checked the registration for 3301 East 98th Street and found that the buildings at that location had never been registered.

Miguel Diaz, an inspector for the City's demolition department, testified as an expert in the field of building inspections conducted to determine Code violations and dangerous conditions. Diaz testified that he was familiar with the Property as part of his duties as a building inspector for the City. Diaz explained that Building I contained a grain elevator, Building II contained multiple silos, and Building III was merely a four-foot foundation consisting of concrete and rocks. Within two or three blocks on the south side of the Property, there were a number of residential homes. On the other sides of the Property, there was the Calumet River, the Skyway Expressway and a railroad.

Diaz testified that he conducted an inspection of the Property between 8 to 10 times. During his first inspection on July 12, 2000, Buildings I and II were open. On September 4, 2002, the date of his last inspection, Building I remained open on the southeast end, with openings large enough to allow an individual to go inside the building. Diaz testified that anyone could gain access to the Property by going over the railroad property or by arriving "right at the front gate." Diaz testified that on several occasions when he visited the Property during the day, there was no one on the Property and he gained access to and remained on the Property for about 30 minutes before he was stopped. Diaz testified that he found graffiti inside and on the outside of the buildings, as well as water bottles, coffee cups and beer cans on the Property. Diaz noticed people working on the railroad and the barges, but did not see any other activity in or near the buildings. Both Buildings I and II were unoccupied, vacant and not being used on a daily basis.

Diaz also testified that the exterior of Building I contained sheet metal that was rusted and deteriorated. This sheet metal had holes in it and was falling off the structure. Diaz testified that the sheet metal and iron on the outside stairs and windows was also falling off of the structure. Diaz testified that the Property posed a dangerous condition because Building I was a tall structure and there was a possibility that, on a windy day, the sheet metal could blow off and injure individuals working in the area. Diaz testified that the exterior stairway was also in a dangerous and hazardous condition. He testified that it was damaged with a large dip in the center of the landing,

missing handrails and treads. Diaz also stated that there was broken glazing and standing water on the bottom level of Building I. Diaz testified that these conditions existed when he conducted his original inspection of the Property on July 12, 2000, and had not changed during his subsequent inspections. The only change Diaz noticed during his subsequent inspections was that some of the area near the building had been cleaned up. Diaz testified that the dangerous conditions could be abated by removing the rusted sheeting and iron as well as the outside stairs.

Diaz also described the conditions inside Building I. He testified that there were holes in the floors of all levels of the approximately 150-foot-tall building, creating a dangerous and hazardous condition. Diaz stated that these holes existed on the first level of the building on July 12, 2000, but could be abated by properly securing the openings. Diaz testified that as of September 20, 2002, the date of his most recent inspection, very few holes had been covered and those that were covered had insufficient coverings made of flimsy material that could be kicked away. Diaz also stated that the electrical and mechanical systems in the building, such as pulleys, conveyor systems, and boiler, were not operable and were also in dangerous and hazardous condition.

Diaz testified that the silos of Building II showed extensive deterioration, with cracked and broken concrete and rusted parts. He explained that this created a dangerous and hazardous condition because there was loose and broken concrete at different levels of the silos and large chunks of concrete lying near the roofline opening of the silos. Diaz stated that the roof of the silos was deteriorated and at risk of collapsing, making it dangerous because chunks of concrete could fall and cause death or serious injury. The fire escape was also in dangerous condition, with loose sheeting and iron lying on top of it. Diaz stated that inside the building it was very dark and difficult to walk around without a flashlight. Diaz stated that the mechanical and electrical systems in the building were inoperable and rusted, some with sharp edges and wires that had been stripped. Diaz testified that these conditions existed on July 12, 2000, and had not been ameliorated before his subsequent inspections. Diaz stated that during his later inspections, he noticed that the roof "may have gotten worse."

Diaz also described a pit, about 10 feet deep and 50 feet long, located between Buildings I and II, which created a risk of injury if someone fell into the pit. Diaz testified that although a fence had been put up around the pit, it was inadequate because there was no tubing along the bottom of the fence and all the way around to prevent a person from falling through the fence.

Diaz described Building III as a partially demolished structure with a broken foundation, debris and loose bricks. Although some walls standing at the time of the July 12, 2000, inspection had been subsequently removed, Diaz testified that the building remained in dangerous and hazardous condition. Diaz testified that the danger could be abated by the removal of the foundation and the broken debris. Diaz's opinion was that the buildings on the Property were in dangerous and hazardous condition; posed a risk to the public health, safety, and welfare; constituted a public nuisance; and were in violation of the Chicago Municipal Code.

Anton Zupan[1], an iron inspector for the City, also testified as an expert witness. Zupan testified that he was responsible for inspecting commercial, industrial, and residential buildings with an emphasis on fire escapes, dust catchers, power antennas, water tanks, and cornices. He stated that he has lived in the area close to the Property for approximately 70 years and is familiar with the area. Zupan testified that both Buildings I and II were currently vacant and were not being used for any purpose. The area surrounding the Property was both residential and industrial, with occupied homes located one to two blocks from the Property. Zupan stated that he saw graffiti on the Property, which indicated to him that someone was on the Property at one time. He stated that he has seen a number of leisure boats as well as fishing boats on the river and that a lot of fishermen fish in the area.

Zupan testified that he conducted two inspections of the Property, on March 21, 2001, and September 4, 2002. Zupan testified that he was able to gain access to the entirety of Building I and he described the conditions of that building. Zupan stated that a lot of loose metal sheeting had fallen from the building and landed on the roof below, which created a dangerous and hazardous condition because it could be blown away by the wind. Zupan also stated that the metal grain elevator posed a dangerous and hazardous condition because it was deteriorating and had holes in it. Zupan stated that the exterior stairs were in a state of dangerous disrepair because they had parts that were missing or rusted. Zupan stated that the conveyor buckets used for transporting corn to the silos were rusted and could fall and cause injury or death. The ductwork in the roof was rusted, and vent covers on the roof were so loose that Zupan could move them with his hand. Zupan testified that inside Building I, the handrails were loose and in

---

[1]In the record, the witness's name is spelled "Zurkin." However, in its brief, the City informs this court that this is a misspelling and that the correct spelling is "Zupan."

dangerous condition and the mechanical systems were rusted and deteriorated, which created a danger because they could fall on someone.

Zupan testified that the exterior of Building II was rusted and in dangerous condition because it could collapse; the metal supporting the building was loose; the fire escape was rusted and pipes were bent and could separate from the building and fall off. Zupan further testified that if the conditions were not abated, the building "would or could" collapse.

John Rukavina, a former employee of the City's building department, testified for Elevated. Rukavina testified that he had inspected the Property three or four times and had viewed both the interior and the exterior of the buildings. Rukavina stated that all of the buildings were vacant and had been out of operation for between 20 and 30 years. Rukavina testified that some of the dangerous and hazardous conditions improved over time. Rukavina testified that the support beams in Building I were deteriorating and rusted, but he stated that they were "still solid." Rukavina also testified that the metal sheeting on the exterior of Building I was "all rotted out" and should be removed; that the glazing on the exterior of Building I was broken and in hazardous condition; that the fire escape was deteriorating; that the steel outside Building I should be removed; and that the floors of Building I had holes through which someone could fall if he or she got inside the building.

John Kindra, a member of Elevated, testified that Elevated has owned the Property since 1994 and uses it to operate a tugboat business which employs six or eight employees. Kindra stated that the loose metal on Buildings I and II was still there and that the upper floors in Building I still had holes that remained uncovered.

On September 27, 2002, the City moved to voluntarily dismiss counts III, VI, VIII, and XI of its complaint. Counsel for the City also explained that on count II, the City was seeking daily fines for 720 days under the Unsafe Buildings Ordinance, calculated from October 3, 2000, the date Elevated was served with summons, to September 23, 2002, which was the date of the trial. The City also explained that on count IX, it was seeking fines for 770 days under the Vacant Buildings Ordinance for Elevated's failure to register Buildings I and II, calculated from August 13, 2000, to September 23, 2002.

The trial court found:

> "The City is in fact entitled to injunctive relief as to certain conditions of the subject property. I'm not requiring the owner to remove equipment that may be within the subject buildings, such as that boiler that was in the basement that provided heat to dry out the grain.

I am authorizing or requiring him to remove those exterior bins and conveying systems that are hanging loose, that have fallen over the last 30 years and I'm sure will continue to fall over the next 30 years if they are not abated now. So I am requiring the removal of those as well."

The trial court found that these conditions should be abated because they were dangerous and hazardous. The matter was continued, at which time the court was to make rulings as to the other counts.

On September 30, 2002, the trial court issued an order wherein it: (1) entered judgment in favor of the City on count I, which sought injunctive relief under the Unsafe Buildings Ordinance; (2) reserved findings and judgments on counts II, IV, V, VII, IX and X until December 9, 2002; (3) ordered Elevated to take steps to abate the dangerous and hazardous conditions on the Property; and (4) allowed the City to voluntarily dismiss counts III, VI, VIII and XI without prejudice.

On January 14, 2003, the trial court issued an order in which it ordered that: (1) Elevated pay a fine of $16,600 for 200 days of violations on count II; (2) Elevated pay fines of $400 on count VII; (3) Elevated pay fines of $12,000 under count IX, for the period of August 13, 2000, to October 12, 2000, which was the date counsel for Elevated filed his appearance; (4) the buildings located on the Property are a public nuisance; and (5) Elevated pay $10,000 in fines under count V, in the amount of $25 a day. During the hearing, the trial court noted that the buildings on the Property had been vacant and abandoned for an extensive period of time. The trial court addressed the fines sought by the City with regard to the remaining counts still pending against Elevated. With respect to count II, which sought fines for unsafe conditions on the Property in violation of the Unsafe Buildings Ordinance, the trial court provided the following ruling:

"The Court is assessing fines and penalties for approximately 200 days, the amount of time that it took defendant to properly secure after service of process was made on the defendant, totaling the amount of $16,600."

On count IX, which sought fines for Elevated's failure to register vacant buildings on the Property in violation of the Vacant Building Registration Ordinance, the trial court provided the following ruling:

"Count 9 is the registration provision for which the City has sought a fine in the amount of 700 and some odd thousand dollars. I am assessing a fine in the amount of $12,000 for the period between August 13th to the date of October 12th, the date in which Counsel filed his appearance.

The Court finds that the spirit of the statute was in fact complied with in that the City had at its disposal the necessary information,

that being the owner, the agent being Counsel, the fact that there was insurance, along with the fact that there was also security on the subject property. The information the City had at its [disposal] via its title searches indicated that there were no other parties in interest."

On February 13, 2003, the City filed a motion to reconsider the January 14, 2003, order. On February 20, 2003, the City filed an amended motion to reconsider the January 14, 2003, order. The City sought to have the trial court reconsider and modify certain portions of its January 14, 2003, order. With respect to the court's rulings on counts II and IX, the City argued that the amounts of the fines under those counts were insufficient because they were less than the minimum fines mandated by the pertinent ordinances. The City requested the court impose a judgment of no less than $144,000 on count II and no less than $308,000 on count IX.

On July 17, 2003, the trial court denied the City's motion to reconsider the penalties imposed under counts II and IX. During the proceedings that were held that day, the trial court stated:

"In determining the penalties under Count 2 imposed by the Court, it's necessary to examine, I believe, the history of this case. I believe and find that the equities and the delays that occurred over the course of time cannot be assessed merely against the defendant. The delays have and were considerable. A significant proportion of the delays occurred during the course of negotiations in hopes of settling the subject matter. However, those settlements, in essence, did not result in an actual agreement.

It cannot, in all fairness, be attributed to the defendant in determining the amount of fine to be imposed. A fine in the amount that the City has so requested would not be equitable and I believe would be unconscionable, in light of the defendant's conduct and course of conduct. The defendant, I believe, should be allowed a reasonable opportunity to abate the violations on the property."

Counsel for the City then asked the court to clarify how it arrived at the sum of $16,600 as the fine under count II. The court stated that it was imposing a fine of $200 per day for 83 days.

The trial court also denied reconsideration of its ruling as to count IX. The court found that the Property had been vacant, noting it had been "dormant and idle for at least the last 30 to 40 years." The court stated:

"The defendant in this case maintained insurance on the subject property well before the requirement of the ordinance. Taxes were paid. Something that is not consistent with an abandoned building or someone who is in disregard as to the responsibilities of ownership. Security was also maintained.

In addition, once counsel for the defendant files his appearance, the City really had at its disposal the necessary information with regard to the person to be notified in the event of an emergency or for service of process.

The defendant did in fact carry out the intent of the ordinance. The penalty for the violation of Count 9 is $12,000 for the period of time from August 13th to the date of October 12, when counsel first filed his appearance."

The City appeals from the trial court's July 17, 2003, order. On appeal, the City contends that the trial court misconstrued the Unsafe Buildings Ordinance and improperly calculated the fines imposed on Elevated. The City also contends that the trial court erred by failing to impose the required fines for each day that Elevated was in violation of the Vacant Building Registration Ordinance's registration requirements.

## ANALYSIS

### I

■ We first will address the issue of whether the trial court properly levied fines with respect to the Unsafe Buildings Ordinance.

We review the trial court's findings of fact to ensure that they are supported by the evidence and that they are not against the manifest weight of the evidence. *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 131 (2004). " 'A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Avenaim v. Lubecke*, 347 Ill. App. 3d 855, 861 (2004), quoting *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).

The Unsafe Buildings Ordinance provides in relevant part:

"If any building shall be found in a dangerous and unsafe condition or uncompleted and abandoned, the building commissioner or the fire commissioner shall notify in writing the owner or owners thereof, directing the owner or owners to put such building in a safe condition, to enclose or to demolish it." Chicago Municipal Code § 13—12—130 (2000).

The Ordinance further provides:

"Any owner who fails to take the action demanded in the notice shall also be fined not less than $200.00 per day and not more than $1,000 per day; for each day from the 16th day after the notice has been given until the building has been demolished, repaired or enclosed. If court action is initiated by the corporation counsel without notice as described in this section, the fine shall be imposed beginning on the day the summons is served on the owner." Chicago Municipal Code § 13—12—130 (2000).

Here, the record shows that the trial court found that the condi-

tions on the Property were dangerous and hazardous in violation of this section of the Chicago Municipal Code. In assessing fines under section 13—12—130, the trial court found that Elevated was in violation of the Unsafe Buildings Ordinance for "approximately 200 days, the amount of time that it took defendant to properly secure after service of process was made on the defendant" and the court imposed fines "totaling the amount of $16,000." However, the record shows that later at the hearing on the City's motion to reconsider, the City argued that the amount of fines was insufficient because section 13—12—130 of the Code requires a minimum fine of $200 per day for violations of the Unsafe Buildings Ordinance. The trial court then stated that it was imposing a fine of $16,600, which amounted to $200 per day for 83 days.

We find that the trial court's original findings of fact were supported by the evidence, where the court heard extensive testimony regarding inspections of the buildings on the Property and determined that Elevated was in violation of the Unsafe Buildings Ordinance for 200 days. However, we find that the trial court's subsequent determination that Elevated was in violation of the Unsafe Buildings Ordinance for 83 days is against the manifest weight of the evidence where the trial court reduced its finding of the number of days, from 200 to 83, in order to comply with the required minimum fines under section 13—12—130 and still impose fines in the total amount of $16,600. We therefore reverse the trial court's determination and remand the cause to afford the circuit court the opportunity to enter judgment in accord with the range of fines pursuant to section 13—12—130 and supported by the evidence in this case.

## II

■ We next consider whether the trial court properly imposed fines on Elevated with respect to the Vacant Building Ordinance.

The Vacant Building Ordinance provides in pertinent part that:

"The owner of any building that has become vacant shall within 30 days after the building becomes vacant, or within 30 days after the effective date of this ordinance, whichever is later, file a registration statement for each such building with the department of buildings on forms provided by the department of buildings for such purposes. The registration shall remain valid for one year from the date of registration. The owner shall be required to annually renew the registration as long as the building remains vacant and shall pay an annual registration fee of $100.00 for each registered building ***." Chicago Municipal Code § 13—12—125(a)(1) (2000).

The Ordinance further provides:

"Any person who violates any provision of this section or of the rules and regulations issued hereunder shall be fined not less than $200.00 and not more than $1,000.00 for each offense. Every day that a violation continues shall constitute a separate and distinct offense." Chicago Municipal Code § 13—12—125(d) (2000).

The City contends that the trial court misconstrued the Vacant Buildings Ordinance by failing to impose the required fines for each day Elevated failed to meet the registration requirement.

In *City of Chicago v. Cotton*, 356 Ill. App. 3d 1 (2005), this court recently considered whether a trial court has discretion to impose a penalty below the minimum penalty required by the Chicago Municipal Code. In *Cotton*, we upheld the mandatory nature of the fines imposed by section 13—12—040 of the Code, relying on a long line of cases requiring courts to enforce statutes and ordinances as written and prohibiting courts from reading exceptions, limitations or conditions into the statutes and ordinances. *Cotton*, 356 Ill. App. 3d at 4-5, citing *Lawrence v. Regent Realty Group, Inc.*, 197 Ill. 2d 1, 10 (2001); *In re D.L.*, 191 Ill. 2d 1, 9 (2000); *Village of Spring Grove v. Kubat*, 201 Ill. App. 3d 991, 993 (1990); *City of Naperville v. Bernard*, 139 Ill. App. 3d 784 (1985); *City of Chicago v. Roman*, 184 Ill. 2d 504, 510 (1998); *City of De Kalb v. White*, 227 Ill. App. 3d 328, 330-31 (1992); *City of Chicago v. Alessia*, 348 Ill. App. 3d 218 (2004).

In this case, there was no dispute that both Buildings I and II were vacant and therefore subject to the registration requirement under the Vacant Building Registration Ordinance. The trial court specifically found that the buildings had "been vacant and abandoned for an extensive period of time" and that the Property had "sat dormant and idle for at least the last 30 to 40 years."

The evidence also showed that the buildings on the Property were never registered pursuant to the Vacant Building Registration Ordinance. Callinan, who administered the City's vacant multiple dwelling registration program, testified that he checked both buildings and discovered that neither had ever been registered. Elevated never refuted this evidence or claimed that the buildings were registered as required by the ordinance. In addition, the trial court ordered Elevated to register its buildings within 72 hours and ordered Elevated to pay the registration fee to the City "for each of the three years [Elevated] did not register the buildings."

Based on this evidence, the City requested that the trial court order Elevated to pay the minimum fines for 770 days for each building that it failed to register under the Vacant Building Registration Ordinance. The City sought a total of $308,000 in fines for Elevated's violation of the ordinance from August 11, 2000 (30 days after the ef-

fective date of the ordinance), until September 30, 2002 (the date of the trial).

The record shows that the trial court found that Elevated was only required to pay fines in the amount of $12,000, for the period between August 13, 2000, to October 12, 2000, the date in which counsel for Elevated filed his appearance. The court explained that once counsel for Elevated had filed his appearance in this action, "the City really had at its disposal the necessary information with regard to the person to be notified in the event of an emergency or for service of process." The court also reasoned that the defendant "maintained insurance on the subject property well before the requirement of the ordinance. Taxes were paid. Something that is not consistent with an abandoned building or someone who is in disregard as to the responsibilities of ownership. Security was also maintained." The trial court therefore found that Elevated "did in fact carry out the intent of the ordinance."

We are compelled to conclude that the circuit court erred in this case by deviating from the registration requirement and penalty range of the ordinance. Section 13—12—125(a)(1) of the Code specifically provides that "The owner of any building that has become vacant *shall* within 30 days after the building becomes vacant, or within 30 days after the effective date of this ordinance, whichever is later, file a registration statement for each such building with the department of buildings on forms provided by the department of buildings for such purposes." (Emphasis added.) Chicago Municipal Code § 13—12—125(a)(1) (2000). The applicable penalty provision in the Code states that "Any person who violates any provision of this section or of the rules and regulations issued hereunder *shall* be fined not less than $200 and not more than $1,000 for each offense. Every day that a violation continues *shall* constitute a separate and distinct offense." (Emphasis added.) Chicago Municipal Code § 13—12—125(d) (2000).

Under the plain language of the Code, no further discretion is invested in an enforcing court. The use of the word "shall" in the Chicago Municipal Code is mandatory, not directory. *Cotton*, 356 Ill. App. 3d at 7, citing *Puss N Boots, Inc. v. Mayor's License Comm'n*, 232 Ill. App. 3d 984, 987 (1992). Therefore, under section 13—12—125, the trial court was not authorized to find that Elevated complied with the Code when its counsel filed an appearance where section 13—12—125 specifically required Elevated to file a registration statement with the department of buildings on forms provided by the department of buildings for such purposes. In addition, the trial court was not authorized to reduce the number of days in which Elevated violated the Code by failing to register where section 13—12—125(d) of the

Code mandates that the court find a separate offense for every day that a violation continues. The circuit court was obligated, after finding Elevated liable, to assess a daily fine within the statutorily authorized range for every day that Elevated violated the Code by failing to meet the registration requirements specified in the Code.

## CONCLUSION

For the foregoing reasons, we reverse the judgment and remand the cause to afford the circuit court of Cook County the opportunity to enter a judgment in accord with the provisions of the Chicago Municipal Code.

Reversed and remanded.

THEIS and O'MARA FROSSARD, JJ., concur.