NOTICE
Decision filed 03/18/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250906-U

NOS. 5-25-0906, 5-25-0907, 5-25-0908 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* LELAND S., COLT S., and CHASE S., Minors | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Moultrie County. |
| Petitioner-Appellee, | ) ) ) | |
| v. | ) ) | Nos. 20-JA-12, 20-JA-13, 20-JA-14 |
| Christopher S., | ) ) | Honorable Jeremy J. Richey, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Barberis and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the circuit court of Moultrie County that terminated the parental rights of the respondent father was not against the manifest weight of the evidence, and therefore, this court affirms the judgment.

¶ 2    In this consolidated appeal, the respondent, Christopher S. (Father), contends the circuit court of Moultrie County erred when it entered an order that terminated Father's parental rights to the minor children, Leland S., who was born in July of 2017, and twin siblings Colt S. and Chase S., who were born in November of 2019. Specifically, Father contends the trial court's decision that Father was unfit was against the manifest weight of the evidence. For the reasons that follow, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     On December 16, 2020, the State filed petitions for adjudication of wardship in the following three cases: 20-JA-12, 20-JA-13, and 20-JA-14. The first case involved Leland, and the subsequent two involved, respectively, Colt and Chase. Because the pleadings that followed are mostly identical, we will refer to the pleadings in 20-JA-12 unless otherwise noted, and we will discuss the cases collectively wherever possible. The petitions alleged, with regard to each child, that the child resided with Father and the children's biological mother (Mother), who is not a party to this appeal. We will refer to Mother in this disposition only when necessary for an understanding of the trial court's rulings in relation to Father's appeal. The petitions further alleged that each child was neglected in that (1) he resided in an environment that was injurious to his welfare and that of his siblings because the environment exposed him "to missed medical and mental health care appointments," and (2) Father and Mother did "not provide adequate support and medical care necessary for" his well-being and that of his siblings. The petitions alleged that it was in the best interests of the boys to be adjudicated wards of the court, but that it was also in their best interests to remain in the home with Father and Mother "so long as the parents cooperate with the service plan developed by One Hope United, to assist and support the parents in dealing with the medical needs of the" boys.

¶ 5     On March 24, 2021, a temporary custody order was entered, placing the boys in the care of the Illinois Department of Children and Family Services (DCFS). A shelter care report indicated that on the previous day, Leland had been "found walking in his underwear near a park" and was taken into protective custody by police. The report indicated that when DCFS followed up, they found the condition of the home to be "dirty," with "rotten food all over the floors," and Leland and Colt both to be dirty and bruised as well. Father was arrested for child endangerment.

¶ 6    On August 10, 2021, an amended petition was filed as to Leland only. It alleged that Leland was neglected as a result of inadequate supervision by Father and Mother. On August 16, 2021, an adjudicatory order was entered, wherein the trial court found the boys to be neglected for the reasons alleged in the petitions. The order found that the neglect was inflicted by Father and Mother.

¶ 7    On November 8, 2021, a dispositional order was entered, wherein the trial court found that Father and Mother were unable to care for the boys, and wherein the trial court made the boys wards of the court. Guardianship and custody of the boys was placed with DCFS, with a permanency goal of returning the boys home within 12 months. Father and Mother were admonished to cooperate with DCFS and to comply with their service plans.

¶ 8    Although no permanency review hearing transcripts are present in the record on appeal, seven permanency orders are present with file-stamped dates of April 27, 2022, October 26, 2022, January 24, 2023, April 25, 2023, September 22, 2023, July 25, 2024, and July 2, 2025. In the second and third of these seven orders, the trial court found that Father and Mother had made reasonable and substantial efforts in the recommended services. However, the trial court found in the other five orders that Father and Mother had not made reasonable and substantial efforts in the recommended services. The trial court did not find, in any of the seven orders, that either parent had made substantial progress in the recommended services.

¶ 9    On November 20, 2024, the State filed what was styled as a "motion seeking [a] finding of unfitness and termination of parental rights of [Father and Mother]." The motion alleged that Father and Mother were unfit because they had failed to (1) maintain a reasonable degree of interest, concern, or responsibility for the welfare of the boys; (2) make reasonable efforts to correct the conditions that were the basis for the removal of the boys during any of the four nine-

3

month periods at issue, specifically November 8, 2021, to August 8, 2022; August 8, 2022, to May 8, 2023; May 8, 2023, to January 8, 2024; and January 8, 2024, to October 8, 2024; and (3) make reasonable progress toward the return of the boys during any of the aforementioned nine-month periods.

¶ 10 A fitness hearing began on September 18, 2025. At the outset of the hearing, the State asked the trial court to take judicial notice of the prior records of proceedings and orders entered in each boy's case, specifically the adjudicatory orders, dispositional orders, and all "orders that were entered thereafter." No parties objected, and the court stated that it would take said notice. The State moved for admission of the curriculum vitae of Dr. Judy Osgood, and of the parenting capacity assessment Dr. Osgood authored regarding Mother. Again, there was no objection, and the exhibits were admitted. The parties further stipulated that Dr. Osgood was not available to testify in person, and that her credentials and assessment were admitted instead of live testimony.

¶ 11 Of relevance to Father's appeal, Dr. Osgood stated that the history she received indicated that twins Colt and Chase were born prematurely, and that Colt "was given a synagis injection due to being at high risk for [respiratory syncytial virus]." In March 2020, Colt was due for an additional injection, but "the parents did not respond to 10 phone calls regarding [Colt's] medical needs," even though Colt's failure to get the injection "could lead to long term harm or death." Dr. Osgood noted that Chase had complex medical needs as well, "including AV valve heart defect, pulmonary hypertension and hemihypertrophy," and that "Chase requires a feeding tube, tracheotomy and a ventilator." Chase resided at a special-needs housing facility in Peoria. Dr. Osgood also recounted the incident in which Leland was found wandering unsupervised in his underwear near a park.

4

¶ 12    The first witness to present live testimony was Father. He testified that he presently lived with his mother in Lovington, Illinois, while awaiting the remodeling of his "new place." He testified that he presently saw Leland and Colt every Friday, and that he wanted "to go see Chase," but that although he had asked multiple caseworkers, multiple times, it had been "a continuous runaround for the last two and a half years." He testified that sometimes he was told he needed supervision for such visits, and other times he was told he did not, and that "it's very hard to stay in touch with" agency workers about arranging visits with Chase at the special-needs housing facility where Chase lives. When asked if he thought Chase would recognize him, Father testified, "No, I don't." He agreed that he was probably a stranger to Chase. He testified that he was no longer familiar with Chase's medical needs, including related to an AV heart defect, but added that he had told caseworkers that he would "be more than willing to retrain" with regard to those needs. He testified that he understood that with regard to each of Chase's medical conditions, it was "absolutely vital that [he] follow through with regular medical checkups and appointments." With regard to caring for Chase's extensive medical needs at home, Father testified that he believed Chase would have "in-home nursing around the clock," but conceded that he had not "arranged for that" yet. He testified that he could not arrange it until he was able to visit Chase and talk to his nurses more about it. He testified that he believed that once he moved into his new place, and was "retrained" on Chase's medical needs, it would be in Chase's best interests to live with him.

¶ 13    Father testified that he was aware of the allegation that he struck Leland in the face in March of 2024 but denied that he did so. He testified that Mother and Mother's mother told Leland to say Father hit Leland but again stated that it was not true. He conceded that he did not appeal the DCFS indication that it was true. He testified that he did not believe appealing the finding

5

"would do [him] any good." He testified that he was not aware of medical diagnoses or medications for Leland or Colt, because he was "not kept in the loop of any of that."

¶ 14    Father testified that he worked at CHI in Arthur, Illinois, building garage doors, and had "been back there for almost two years." He testified that he worked from "[f]ive to five, Monday through Friday," and did not work a second job. He testified that if he was given custody of the boys, his mother would help take care of Leland and Colt while he was working, and that Chase "would have to have the constant in-home nurse." He testified that he and Mother did not speak often, but that if he had custody of the boys, "it would have to be a more consistent thing to where we could coparent on a more mature level than *** in the past."

¶ 15    With regard to compliance with his service plans, Father testified that when asked to do additional parenting education, he agreed to do so, but "was never told a date" to attend. He denied that he received a referral to go to Cognition Works, or anywhere else. He testified that he completed "a court-approved and DCFS-approved" online training course. When asked why he did not complete it earlier in the case, he testified that he "was not made aware" that he needed to do the training until his last court date.

¶ 16    On cross-examination, Father testified that he wanted to visit Chase on a weekend, so that the visit would not disrupt his job and income, but that no caseworker had been available to supervise him on a weekend visit. He testified that he was aware that he could not have an unsupervised visit with Chase until he had "two full 24-hour shifts with Chase." He testified that he arranged his weekly visits with Leland and Colt through Becky Hoover of One Hope United. He testified that the only visits he missed were those that were cancelled by Hoover, due to car problems Hoover was having. Father further testified that prior to the indicated finding that he had slapped Leland, Father had completed all "parenting classes and services that [he was] asked to

do," and that it was only after the indicated finding that DCFS "added additional services." He testified that he had now completed all of those services and was currently enrolled in "anger management counseling." He thereafter stated that his first anger management counseling session was held the day before the present hearing.

¶ 17 Father testified that on June 16, 2025, a "home safety check" was done at the trailer he lived in at that time, and the trailer "was clean and appropriate and approved." He testified that although he had not seen Chase in two and a half years, he did "try to call weekly to check up on him," and added that he had "called last week" and been told that Chase "was doing good" overall. He agreed that in the past two and a half years, he had "never sent Chase a birthday gift or Christmas gift." When asked why he had not sent gifts to Chase, Father testified, "I just have forgot about it."

¶ 18 Amanda Drummond testified that she was Mother's mother, and the foster parent for Leland and Colt. She denied Father's accusation that she told Leland to claim that Father smacked him. She testified that Leland told her that Father smacked him. She testified that she did not observe any marks or bruises on Leland's face, and that she contacted Leland's caseworker. Drummond testified that she was the parenting time supervisor for Mother's visits with Leland and Colt, which occurred every Sunday for two hours. She denied that she had ever heard Mother tell Leland that Leland should say Father smacked Leland. She testified that her relationship with Father was not "very great," because when Father and Mother were together, Drummond was not allowed to see the boys. She testified that Leland and Colt had lived with her since 2021, when they were removed from the care of their parents. Drummond testified that she tried to visit Chase "every other month," but that due to Chase's severe medical issues, it was often difficult, because she did not want to take Leland and Colt to visit Chase when they were sick. She testified that she

7

believed Chase recognized her and the boys, and that he smiled at Leland and Colt when they visited.

¶ 19    On cross-examination, when asked if Leland and Colt were "excited" about their visits with Father, Drummond testified, "They were to an extent." She added, "They were happy at the time, but then after the visit, it was like they were ready to go home." She testified that the boys told her about having dinner with their paternal grandmother during the visits, but did not discuss the visits other than that. She testified that the boys were happy to see her after the visits, and the boys never asked for additional time with Father, or with Mother. When asked again about interactions following visits with Father, Drummond testified that the boys did not really talk about Father or the visit, although they would sometimes tell her they had gone bowling or to a restaurant.

¶ 20    Janessa Watson testified that she was a foster care case manager with One Hope United and had been for three years. She testified that until one month prior to the hearing, she was "the primary caseworker" for Leland, Colt, and Chase. With regard to Father's testimony about his difficulties visiting Chase, Watson testified that she offered "to meet him in Peoria twice in July" to supervise visits, but Father told her "that he works Monday through Friday and wasn't able to go to the visit." She testified that Father insisted the visits had to be on weekends, and testified that although Hoover could supervise Father at the visits, that would involve a lot of overtime for Hoover, which would have to be approved by "higher up departments." She testified that Hoover would also have to use her own vehicle for those visits.

¶ 21    Watson testified that to her knowledge, Father had not completed an anger management course. She testified that he had not told her that he was engaging in counseling. She testified that he also did not tell her about the birth of his daughter. When asked why the boys could not be returned to Father once he moved out of his mother's home, Watson testified that at present, "we

don't have a home to inspect," and added, "[w]e don't have anywhere to see where he would be able to care for these children, have enough room, have enough space." She testified that although Father "stated that he has a family member that is \*\*\* a certified nursing assistant," that "is different than a registered nurse." She testified that she did not believe "the level of care that Chase needs" could "be met with a certified nursing assistant rather than a registered nurse."

¶ 22    Watson testified that she sent in an anger management referral for Father at Life Links, not at the provider he testified he was receiving anger management counseling from, and that she was surprised to learn he was not using the provider she referred. With regard to Father caring for Chase, Watson testified, "I do think it would be incredibly difficult to manage a child who has a trach, a ventilator, a feeding tube," and that Chase required "around-the-clock care." Watson testified that Father had not provided her with a plan for how he could "integrate full-time nursing care into his home with his other children present as well." She testified that Chase was now considered to be medically stable, and under the right circumstances could be discharged for home living. Watson testified that she believed Drummond was willing to facilitate visits between Father and Leland and Colt.

¶ 23    On cross-examination, Watson testified that she did not believe that Father had ever asked her if someone other than Drummond could supervise visits with Leland and Colt, and Watson did not know if Father had asked other caseworkers. She testified that when she took over the case in January of 2025, she reviewed the case notes "to get a feel for the case," and learned that Father was supposed to be doing parenting classes again but refused. She testified that she was told that Father had not engaged with Chase by phone call "for at least the last couple of months," and "hadn't visited in over a year." She thereafter agreed that it had been approximately two and a half years since Father last saw Chase. Watson testified that during her time on the case, Father was

not "any closer to having the children returned home to him than he was at the start of the case." When asked what she based that opinion on, Watson testified that it was based on his failure to complete anger management and parenting classes, and the fact that after four years, he was still allowed only agency-supervised visits. She later clarified that Father originally completed parenting classes but was re-referred after the indicated finding that he smacked Leland, and that he did not complete the classes a second time. She agreed that it was the previous caseworker, not Watson, who informed Father of the need to complete the services again.

¶ 24 Following Watson's testimony, the hearing recessed for the day. When the hearing continued on the following day, September 19, 2025, the parties presented argument. The trial court thereafter stated that it found that the State had met its burden to prove, by clear and convincing evidence, that both Mother and Father failed to make any reasonable progress in the case. The court stated that it found Father's testimony credible, but that the State nevertheless had met its burden. The court additionally found that Father had failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of Chase, who Father had not visited in over two years, and toward whom Father had shown a "lack of appropriate attention at birthday and Christmastime, no gifts, no cards, et cetera." The court found that Father "[p]robably" could have visited Chase on a weekday, although not each week, because Father had to work. The court stated that "[a]t the very least, [Father] could have taken a personal day or a vacation day." The court added, "You've got to make the effort, and this father did not make the effort." The court found, however, that with regard to Leland and Colt, the State had not shown by clear and convincing evidence that Father had failed to maintain a reasonable degree of interest, concern, or responsibility for their welfare. The court further found that the State had not shown by clear and

10

convincing evidence that Father failed to make reasonable efforts to correct the conditions that were the basis for the removal of the boys during any of the nine-month periods at issue.

¶ 25     With regard to reasonable progress, the court agreed with the State that after four years, "nothing has changed" and "[t]he parents just aren't making any progress." The court stated that there was "just no evidence" that Father and Mother were taking the information they had learned "and applying it in a way that could make a difference in the parenting in this situation." The court found that Father's failure to appeal the indicated finding "show[ed] a lack of progress" as well. The court acknowledged that Father and Mother both were "in some counseling at the moment," but stated that these efforts were "brand-new *** within the last couple weeks" and were "too little, too late." The court noted Father did not have adequate housing, and the court found it "telling" that "when both parents are asked about their plan for how they're going to deal with all these children if they get them back, I would say their plan is not a plan." The court described the plans as too generalized, with "[n]o specific action plan how this is actually going to get done." The court stated this was particularly problematic in light of the boys' extensive special needs, especially with regard to Chase, and added, "if there's ever a case that needed careful planning, this is one of them." The court stated that it agreed with the State that it was problematic that after four years, both parents still were on supervised visits. The court further stated that the removal of the boys from the home should have been "a wake-up call," but that instead the parents had made "no progress" toward the return of the boys.

¶ 26     On October 23, 2025, a best interests hearing was held. Because Father does not challenge the best interests findings on appeal, we do not recount the testimony from that hearing. We do note, however, that at the conclusion of the hearing, the trial court found that the State had met its burden of proving that it was in the best interests of the boys for the parental rights of Father and

11

Mother to be terminated. The court stated that it had considered all of the appropriate statutory factors and thereafter discussed its reasoning. The court then stated, "Children need permanence. These cases cannot go on forever." The court added that Father and Mother had "been given more than ample time, and that's certainly not the only factor the court would consider, but they've had more than ample time." The court stated that it did not believe that Father or Mother would ever "be able to fully take care of Chase's needs." On October 24, 2025, the trial court entered a written order that was consistent with the court's oral pronouncements. This timely appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    Parents have a fundamental liberty interest in the care, custody, and management of their children. See, *e.g.*, *In re D.T.*, 212 Ill. 2d 347, 363 (2004). The involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *M.I.*, 2016 IL 120232, ¶ 20; *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness"). Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *C.W.*, 199 Ill. 2d at 217. In other words, "only one ground of unfitness need be proved to find a parent unfit." *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 29    If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor children to terminate parental rights. *D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings,

the court's focus necessarily shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life" (*D.T.*, 212 Ill. 2d at 364), because a prompt, just, and final resolution of a child's status, as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 30      On appeal, this court accords great deference to the trial court's decisions in termination proceedings because the trial court is in a better position to observe witnesses and to judge their credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the trial court's findings of parental unfitness or the child's best interest are against the manifest weight of the evidence, this court will not disturb the trial court's findings. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 31      In this case, the trial court found Father unfit as to all three boys due to Father's failure to make reasonable progress toward the return of the boys during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is judged by an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The "benchmark" for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires

measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent has made reasonable progress when the trial court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 32    On appeal, Father contends the trial court's decision with regard to fitness was in error because Father "was gainfully employed and maintained stable and safe home environments throughout the nine-month periods alleged, and he was about to move to another suitable, larger residence." Father also contends that he "participated in all his scheduled visits with Leland and Colt, and regularly tried to obtain the supervision required of him in order to visit Chase, only to meet with delay and failures by the agency to work with him." Father concludes that he "completed training in the care of Chase and was willing to repeat it."

¶ 33    However, as the State accurately notes, Watson testified that Father did not complete the services required of him after the DCFS-indicated finding that Father struck Leland, and testified that the previous caseworker told Watson that Father "refused" to complete the services. Father admitted that he did not appeal the indicated finding but testified that, once he learned he was required to perform additional services, he completed them. However, as the State points out, even if Father's testimony is credited, he did not complete the additional services prior to the end of the four nine-month time periods at issue, and therefore his claim does not show reasonable progress during the required time periods. The trial court apparently agreed, stating that although Father and Mother both were "in some counseling at the moment," these efforts were "brand-new *** within the last couple weeks" and were "too little, too late."

¶ 34    The State is also correct that all of the permanency orders found that Father did not make reasonable progress, and that six of these seven orders encompass the four nine-month periods at

14

issue. In addition, Watson testified that during her time on the case, Father was not "any closer to having the children returned home to him than he was at the start of the case," an opinion Watson based not only on Father's failure to complete the additional services, but also on the fact that after four years, Father was still allowed only agency-supervised visits. The trial court noted this testimony and stated that it agreed with the State that it was problematic that after four years, both parents still were on supervised visits. The court further stated that the removal of the boys from the home should have been "a wake-up call," but that instead the parents had made "no progress" toward the return of the boys.

¶ 35 The evidence also showed that although Father expressed a desire to be reunited with the boys, he did not have suitable housing at the time of the hearing, only plans to obtain it, and to obtain care for the boys. The court noted this, and found it "telling" that "when both parents are asked about their plan for how they're going to deal with all these children if they get them back, I would say their plan is not a plan." The court described the plans as too generalized, with "[n]o specific action plan how this is actually going to get done." The court stated this was particularly problematic in light of the boys' extensive special needs, especially with regard to Chase, and added, "if there's ever a case that needed careful planning, this is one of them." Indeed, Father conceded in his testimony that Chase needed "in-home nursing around the clock," but stated that he had not "arranged for that" yet. Although he testified that he could not arrange it until he was able to visit Chase and talk to his nurses more about it, he did not explain why he could not talk to the nurses, or other facility staff, by phone to make such arrangements. He also conceded that he would have to be fully retrained on Chase's medical needs before Chase could be released to his care.

15

¶ 36    The evidence recounted above demonstrates, unequivocally, that "in the near future" the trial court would not be able to order any of the boys returned to Father's custody, and thus that Father failed to make reasonable progress. See *L.L.S.*, 218 Ill. App. 3d at 461. In reaching this conclusion, we reiterate that the trial court was in the best position to judge the credibility of the witnesses, including Father (see *Dal. D.*, 2017 IL App (4th) 160893, ¶ 53), and that we will not reweigh the evidence or reassess the credibility of those witnesses. *M.A.*, 325 Ill. App. 3d at 391. The opposite conclusion to that reached by the trial court in this case is not clearly apparent, and the trial court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the trial court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we will not disturb it. *A.W.*, 231 Ill. 2d at 104.

¶ 37    As explained above, "only one ground of unfitness need be proved to find a parent unfit." *J.P.*, 261 Ill. App. 3d at 174. Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the trial court's decision if the evidence supports its finding as to any of the grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64. Accordingly, we affirm the trial court's finding of unfitness on the basis of Father's failure to make reasonable progress toward the return of the boys. Father does not contest the trial court's decision regarding the best interests of the boys. Accordingly, we do not address that decision.

¶ 38                                  III. CONCLUSION

¶ 39    For the foregoing reasons, we affirm the judgment of the circuit court of Moultrie County.


¶ 40    Affirmed.